STATE OF NORTH CAROLINA v. DANIEL CUMMINGS, JR.

No. 4A95

(Filed 24 July 1997)

## 1. Jury § 70 (NCI4th)— capital murder—jury selection—requested instruction—presumption of innocence—denied

The trial court did not err in a capital first-degree murder prosecution by denying defendant's requested instructions during jury selection that the presumption of innocence remained in place even though they would be asked questions concerning the possible sentencing phase. The trial court instructed the jury as required by N.C.G.S. § 15A-1213; the court in a capital case is not required to give any instructions other than those mandated by statute and nothing in this statute requires the court to instruct prospective jurors concerning the presumption of innocence. Moreover, the court correctly instructed the impaneled jurors of defendant's presumption of innocence at the appropriate time.

**Am Jur 2d, Jury §§ 189 et seq.**

## 2. Criminal Law § 1379 (NCI4th Rev.)— capital murder—jury selection—instructions—Issue Three

The trial court did not err in a capital prosecution for first-degree murder in its instruction during jury selection on Issue Three, which involves weighing aggravating and mitigating circumstances. Although defendant contended that the instructions improperly shifted the burden of proof to defendant to gain a unanimous verdict on Issue Three, the instructions given by the court during jury selection were a correct statement of the law in that the jury is required to reach a unanimous verdict on its sentencing recommendation regardless of whether it is death or life imprisonment, the trial court correctly stated the four issues put before the jury during the penalty phase of the trial, the jurors were reminded that the instructions they had received were simply a short statement of procedure, the jurors were given complete instructions on sentencing procedure when they retired, and those instructions were accurate statements of the law and in no way shifted the burden of proof to defendant to gain a unanimous verdict on Issue Three.

**Am Jur 2d, Criminal Law §§ 598, 599, 609.**

**3. Jury § 260 (NCI4th)— capital murder—jury selection— peremptory challenge—not based on race**

The trial court did not err during jury selection for a capital first-degree murder prosecution by overruling defendant's objection to the peremptory challenge of a prospective juror where defendant had argued that the challenge was based upon race. The reasons for the challenge volunteered by the prosecutor involved hesitancy about the death penalty and the juror's knowledge of persons and places related to controlled substances and crimes of violence. Reservations by jurors concerning their ability to impose the death penalty constitute a racially neutral basis for a peremptory challenge, and prosecutors may exercise peremptory challenges in order to select a jury that is stable, conservative, mature, government oriented, sympathetic to the plight of the victim, and sympathetic to law enforcement problems and pressures.

**Am Jur 2d, Jury § 234.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-*Batson* state cases. 20 ALR5th 398.**

**Use of peremptory challenges to exclude Caucasian persons, as a racial group, from criminal jury—post-*Batson* state cases. 47 ALR5TH 259.**

**4. Jury § 219 (NCI4th)— jury selection—refusal to impose death penalty—challenge for cause**

The trial court did not err during jury selection for a capital first-degree murder prosecution by excluding a prospective juror for cause when the prospective juror stated that he would follow the capital sentencing scheme but would choose life imprisonment over death. Prospective jurors in a capital case must be able to state clearly that they are willing to temporarily set aside their own beliefs concerning the death penalty in deference to the rule of law; the standard for determining whether prospective jurors may properly be excused for cause for their views on capital punishment is whether those views would prevent or substantially impair the performance of their duties as a juror in accordance with their instructions and oath.

**Am Jur 2d, Jury § 234.**

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

5. **Jury § 226 (NCI4th)— jury selection—position on death penalty—challenge for cause—rehabilitation not allowed**

The trial court did not err in a capital murder prosecution by refusing to allow defendant the opportunity to rehabilitate a prospective juror on capital sentencing where the juror had clearly stated his position on the death penalty, the court extensively questioned the juror concerning his beliefs about the death penalty, and defendant failed to show that any further questioning on his part would have resulted in a different answer.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

6. **Criminal Law § 85 (NCI4th Rev.)— capital murder—initial arrest on other charges—statutory procedures for murder arrest delayed—confessions admissible**

There was no plain error in a capital first-degree murder prosecution where defendant contended that his confessions should have been suppressed for undue delay in transporting him to Brunswick County for purposes of charging him with this murder and in administering the mandatory statutory procedures involved once a defendant has been charged and detained. Defendant was arrested for possession of a stolen vehicle in Sampson County at approximately 1:00 p.m. on 23 April 1994; he was not arrested for this murder (which occurred in Brunswick County) until 28 April 1994, although he was in custody on other charges; the earliest that the detective could have developed probable cause to arrest defendant was during an interview conducted on 24 April 1994; the warrant for defendant's arrest was issued on 25 April 1994; defendant was arrested for this murder on 28 April 1994; and defendant had a first appearance before a district court judge on that same day and an attorney was appointed to represent him on this murder charge. This complied with both the statutory and constitutional requirements. Furthermore, the record reflects that defendant made yet another statement to law enforcement officers concerning this murder

after the mandatory statutory procedures had been carried out in Brunswick County.

**Am Jur 2d, Criminal Law §§ 408 et seq.**

7. **Constitutional Law § 266 (NCI4th)— capital murder—** *Miranda* **warning—appointment of counsel—statement that defendant might have to reimburse state—subsequent confession admissible**

The trial court did not err in a capital prosecution for first-degree murder by not suppressing defendant's confessions because they were obtained after a law enforcement officer chilled defendant's exercise of his right to counsel by statements that defendant might have to pay the State for his lawyer. While advising defendant of his rights, the detective marked out the words "at no cost" in the sentence on the *Miranda* form regarding the provision of a lawyer and explained that it would be at no cost if defendant was found innocent, but that there was a chance the State would require reimbursement if he was found guilty. The detective effectively informed defendant that an attorney would be appointed for him before questioning, if he so desired; *Miranda* does not require that the officer inform an indigent defendant that an attorney would be appointed for him at no cost. The additional information supplied by the detective was accurate in that, while legal assistance is unconditional once indigency is established, the State reserves a general lien against defendant's future earnings if defendant is convicted and should later become able to pay. N.C.G.S. § 7A-451.

**Am Jur 2d, Criminal Law §§ 743 et seq., 972 et seq.**

**Comment Note.—Constitutionally protected right of indigent accused to appointment of counsel in state court prosecution. 93 ALR2d 747.**

8. **Evidence and Witnesses § 2273 (NCI4th)— capital murder—pathologist's testimony—position of wound**

There was no error in a capital prosecution for first-degree murder where the trial court admitted testimony from a pathologist that the victim's wound was consistent with leaning over, lying in a chair when shot. Although the pathologist had not viewed the crime scene, he did have an opinion concerning the direction from which the bullets were fired and the possible position of the victim. The pathologist who performed the autopsy

was in the best position to assist the jury in understanding the angles of the wounds and determining whether those were consistent with circumstances at the crime scene.

**Am Jur 2d, Expert and Opinion Evidence § 262.**

**9. Evidence and Witnesses § 190 (NCI4th)— capital murder— victim's strength in right hand—testimony of son**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by admitting testimony from the son of the victim that the victim had very little strength in his right hand following testimony that the victim was right-handed and kept a pistol by the cash register in the store where he was shot. Although defendant contended that the testimony was speculative and that the probative value was outweighed by the danger of unfair prejudice in that the jury was left with the perception of an elderly man unable to hold a pistol, there was ample evidence to support the finding that the son had personal knowledge of his father's physical condition. The testimony served to impeach the partially self-serving confessions of defendant in that defendant told an officer that he had shot the victim in a struggle over a gun which the victim had attempted to use to protect himself from defendant's robbery attempt and the son's testimony was relevant to the ability of the victim to have armed himself and to have attempted to shoot defendant.

**Am Jur 2d, Assault and Battery §§ 100, 105.**

**10. Criminal Law § 107 (NCI4th Rev.)— capital murder—caliber of bullets—discovery**

There was no error in a capital prosecution for first-degree murder where the trial judge allowed the testimony of an SBI agent concerning the caliber of the bullets found in the victim's store and in his body. Although defendant argues that the evidence was procured in violation of discovery rules, there is no order of discovery in the record and it is apparent defendant was familiar with the evidence which was introduced during the trial. While defendant makes a reference to a request for voluntary discovery, there is no such request in the record and the State is not required to respond voluntarily to a request for discovery. Moreover, any error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt.

**Am Jur 2d, Deposition and Discovery §§ 447, 449.**

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

Exclusion of evidence in state criminal action for failure of prosecution to comply with discovery requirements as to physical or documentary evidence or the like—modern cases. 27 ALR4th 105.

11. **Criminal Law § 697 (NCI4th Rev.)— capital murder— requested instructions—not supported by evidence**

The trial court did not err in a capital murder prosecution by refusing to give defendant's requested instruction on the State introducing a confession which contained exculpatory material where the evidence was neither fully exculpatory nor uncontradicted. The trial court therefore properly declined to instruct the jury that the State was bound by any exculpatory statements contained in defendant's confession.

Am Jur 2d, Trial §§ 674 et seq.

12. **Homicide § 476 (NCI4th)— first-degree murder—instructions—specific intent to kill**

The trial court did not err in a capital murder prosecution by not giving defendant's requested instruction on specific intent to kill where the pattern jury instruction given by the court was in substantial conformity with the one requested by defendant.

Am Jur 2d, Homicide §§ 49, 499, 500.

Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.

13. **Robbery § 135 (NCI4th)— armed robbery—weapon allegedly acquired in struggle with victim—instruction on common law robbery refused**

The trial court did not err in an armed robbery prosecution by refusing to give defendant's requested instruction on the lesser included offense of common law robbery where defendant argued that his confession could have provided a factual basis by which a juror could have found that defendant acquired the gun in a struggle with the victim and that this conduct constituted a common law robbery. The evidence was uncontradicted that the robbery was committed with the use of a deadly weapon; whether defendant carried the gun into the store with him or acquired it in a struggle is irrelevant. Moreover, the uncontra-

dicted physical evidence did not support defendant's contention that a struggle occurred.

**Am Jur 2d, Robbery §§ 75, 76.**

**14. Robbery § 138 (NCI4th)— armed robbery—use of gun— instruction on larceny refused**

The trial court did not err in an armed robbery prosecution by refusing defendant's requested instruction on larceny where the evidence presented provided ample support for finding that defendant's use of the gun was so joined by time and circumstances to the taking as to make them parts of one continuous transaction. Even assuming that defendant's version of events is accurate, the evidence is uncontradicted that a gun was used by defendant in accomplishing his stated purpose of robbing the victim.

**Am Jur 2d, Robbery §§ 75, 76.**

**15. Criminal Law § 1374 (NCI4th Rev.)— capital murder—sentencing—aggravating circumstance—course of conduct— evidence sufficient**

The trial court did not err in a capital sentencing proceeding arising from the robbery and murder of a store owner by admitting evidence that defendant had broken into the home of Lena Hales and killed her during the course of a robbery to support the aggravating circumstance that the murder of the store owner was part of a course of conduct which included the commission of other violent crimes. The evidence, viewed in the light most favorable to the State, tended to show that defendant was seeking money to buy drugs when he broke into Hales's home, that she was badly beaten and died, and that defendant inflicted the injuries which caused her death. A murder is a crime of violence that will support the course of conduct aggravating circumstance, both of these murders occurred within several days of each other, both were committed to obtain money to buy cocaine, both involved elderly victims, and, in the early morning after killing Hales, defendant stole a van which he drove to Brunswick County to commit this murder. This was sufficient to support the conclusion that there existed in the mind of defendant a plan, scheme, system, or design involving both murders.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**16. Criminal Law § 1374 (NCI4th Rev.)— capital sentencing—aggravating circumstance—course of conduct—instructions**

There was no plain error in a capital sentencing proceeding where the court failed to give special instructions as to what conduct could be used in determining whether the course of conduct aggravating circumstance existed. The instructions given by the court were a correct statement of the law; juries in North Carolina considering the course of conduct aggravating circumstance have never been required to specify which crimes constitute the violent crimes required for the finding of this aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**17. Criminal Law § 1342 (NCI4th Rev.)— capital sentencing—details of prior killing—Rule 403 balancing not required—admissible**

The trial court did not err in a capital sentencing proceeding by admitting evidence concerning the details of a prior killing where defendant argued that the probative value of the evidence was outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The North Carolina Rules of Evidence do not apply in sentencing proceedings and the trial court was not required to perform the Rule 403 balancing test. The evidence was relevant to the course of conduct aggravating circumstance and not merely to show that defendant had killed the victim, but also to demonstrate his conduct in committing that murder.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**18. Criminal Law § 1351 (NCI4th Rev.)— capital sentencing—instructions—Issues Three and Four—unanimity**

The trial court did not err in a capital sentencing proceeding by refusing to instruct the jury that it did not need to be unanimous in order to answer no to Issues Three and Four.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

**19. Criminal Law § 1402 (NCI4th Rev.)— death penalty—not disproportionate**

A sentence of death was not disproportionate where the evidence supports the aggravating circumstances found, the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, and the sentence was proportionate in that this case is more similar to certain cases in which the sentence was found proportionate than to those in which it was found disproportionate or to those in which juries have consistently returned recommendations of life imprisonment. Although defendant argued that the sentence was disproportionate because the jury found twenty-eight of thirty-two mitigating circumstances and because of defendant's remorsefulness, the number of mitigating circumstances does not suffice to render a death sentence disproportionate and there is little evidence in the record that defendant expressed remorse. By contrast to the defendant in *State v. Bondurant*, 309 N.C. 674, this defendant shot the victim several times, left the victim lying helplessly on the floor, did not seek medical aid for the victim, stole money from the victim in order to buy drugs, and immediately fled the scene.

**Am Jur 2d, Criminal Law §§ 609, 627, 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Thompson, J., on 16 December 1994 in Superior Court, Brunswick County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for robbery with a dangerous weapon and assault with a deadly weapon with intent to kill was allowed 19 January 1996. Heard in the Supreme Court 11 September 1996.

*Michael F. Easley, Attorney General, by Thomas S. Hicks, Special Deputy Attorney General, for the State.*

*William F.W. Massengale and Marilyn G. Ozer for defendant-appellant.*

ORR, Justice.

This case arises out of the murder of Burns Babson. At the time of his death, Mr. Babson was operating a store which was located within fifty feet of his home in Ash, North Carolina, where he resided

with his wife of over fifty-two years. On 23 May 1994, defendant was indicted for first-degree murder, robbery with a dangerous weapon, and assault with a deadly weapon with intent to kill arising out of the slaying of Mr. Babson. Defendant was tried before a jury, and on 14 December 1994, the jury found defendant guilty of all charges. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder conviction. In accordance with the jury's recommendation, the trial court entered a sentence of death for the first-degree murder conviction based on the theory of premeditation and deliberation and the felony murder rule. The trial court also sentenced defendant to consecutive sentences of forty years' imprisonment for the robbery conviction and ten years' imprisonment for the assault conviction.

After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial, free from prejudicial error.

At trial, the State's evidence tended to show the following: On 22 April 1994, while in her home, Mrs. Babson heard three or four gunshots fired in rapid succession. She ran into the yard and saw a man standing in the doorway of her husband's store. The man went around to the front of the store building, fired a gun at Mrs. Babson, and then got into a white van parked near the store. Mrs. Babson ran to a neighbor's house and called 911. She then entered the store, where she found her husband lying on the edge of a recliner behind the counter with a bullet wound in his head.

Ronnie Babson, Mr. Babson's son, operated a garage next door to his father's store. Shortly after his father's murder, Ronnie entered the store and went over to where Mr. Babson's body was lying. He moved Mr. Babson's head from the chair and placed his body on the floor. He noticed that the .38-caliber revolver which his father ordinarily kept behind the counter was missing.

Brunswick County Sheriff's Detective Tom Hunter arrived at the store at 7:56 p.m. Detective Hunter found Mr. Babson's body on the floor behind the counter and noted that there were gunshot wounds on the right side of the victim's head and in his back just above his waistline. Detective Hunter also observed two bullet holes in a box of receipts adjacent to the north wall of the store behind the counter.

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

Donald Ray Long testified at trial that he owned and operated Brunswick Farm Supply, which is located about one mile east of Mr. Babson's store. On 22 April 1994, at approximately 5:00 p.m., defendant drove a white Ford van into the driveway of Long's business. Mr. Long further testified that defendant got out of the van and asked him for directions to the beach. Defendant then drove off in the direction of Mr. Babson's business. Shortly thereafter, Mr. Long left his business and saw a van like the one driven by defendant at a gas station halfway between his business and Mr. Babson's store.

Martha Dean Fowler testified that she was operating Martha's Corner Store on the day of Mr. Babson's murder. The store is located about six miles from Mr. Babson's store. She stated that defendant entered her store twice on that evening. Around 7:45 p.m., defendant drove up to her store in a white van. He then entered the store and purchased a soft drink and a pack of cigarettes. Ms. Fowler further testified that defendant returned to her store sometime between 8:30 and 9:00 p.m. He was dressed in a plaid shirt and blue jeans and appeared quite nervous. Ms. Fowler testified that she gave him directions to Wilmington, and he then left the store.

On 23 April 1994, Sampson County Deputy Sheriff Everette Jones received a call to be on the lookout for "a white and green Ford Astro van" with North Carolina license plate number "Robert X-ray 8586" traveling north on U.S. 421. The call indicated that the driver would be "a dark[-]skinned white male with a greenish t-shirt and blue jeans and two or three days' facial hair growth." Deputy Jones testified that after receiving the call, he returned to a place on U.S. 421 where he had previously seen a white Ford van. He found the van parked on the side of the road, approximately six miles north of Clinton. Deputy Jones then verified that the license plate of the van matched that of the vehicle mentioned in the report. As Deputy Jones got out of his marked patrol car, defendant began to walk away from the van.

Deputy Jones testified that he approached defendant, handcuffed him, and told him that he was being detained. He placed defendant in the patrol car, called the dispatch center, and requested that they run the vehicle identification number through their computer. The information which Deputy Jones received indicated that the van was stolen. Based on that information, Deputy Jones placed defendant under arrest.

On 24 April 1994, Detective Hunter arrived at the Sampson County jail to interview defendant. Detective Hunter had been

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

informed that a suspect matching the description he put out had been detained in Sampson County. Prior to interviewing defendant, Detective Hunter advised him of his rights, and defendant signed a written waiver of those rights. Defendant then described the sequence of events leading up to Mr. Babson's murder. He told Detective Hunter that he was picked up by a black male named Joe driving a white van. Defendant said that the two of them drove around for several days, buying and smoking crack cocaine. Defendant stated that he and Joe had stopped at Mr. Babson's store for a drink of water on the day of the murder. They left the store only to return twenty or thirty minutes later intending to rob Mr. Babson. Defendant parked the van and then walked around the store. He heard four shots fired, went into the store, and saw Mr. Babson lying behind the counter. Defendant saw a woman near the store, fired one shot at her, and returned to the van where he found Joe waiting.

The next day, defendant was again interviewed by Detective Hunter and SBI Agents Janet Storms and Wayne Johnson. The interview took place at the New Hanover County Sheriff's Department, where defendant had been transported for the administration of a polygraph examination. Defendant was once again advised of his rights prior to the interview and voluntarily signed a waiver of those rights. Defendant then made a statement, which was reduced to writing, concerning the events surrounding Mr. Babson's murder. Defendant stated that "[o]n Wednesday[,] April 20th, 1994, [he] stole a white van from Shannon, North Carolina." He further stated that he rode around and "smoked crack cocaine for the next day or two." He then began to check out stores to rob in the Ash, North Carolina, area. He saw an old man running one of the stores by himself and decided it "looked easy to rob." Defendant left and returned about thirty minutes later. Defendant then described the events which followed:

I parked the van outside and left the door open. I went inside and asked the old man about the pool tables. He told me to go on in and cut the lights on. I told the old man to, 'Give me your money'. The old man went towards the cash register and I thought he was going to get the money. The old man came back with a gun and shot at me. I crawled around the counter and we struggled over the gun. I believe I heard or counted about four shots that went off inside the store. I took the old man's wallet . . . . I did not see where the old man got shot. I got the money out of the cash register and left the old man laying face down in the chair.

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

Defendant stated that as he was leaving, he saw a lady through the screen door and fired the gun to scare her. Defendant then got into the van and left, eventually stopping at a store to ask directions. Defendant remained in custody after this statement was given.

On 28 April 1994, Detective Hunter once again spoke with defendant concerning the events surrounding Mr. Babson's death. Defendant was again informed of his rights and once again voluntarily signed a waiver of those rights. At that time, defendant had been arrested for the murder of Burns Babson. Defendant proceeded to make another statement very similar to the one set out above.

Dr. John Leonard Almeida, an expert in the field of forensic pathology, performed an autopsy on the body of Burns Babson. Dr. Almeida noted two bullet holes in the body of Mr. Babson, both of which were entrance wounds. One was in the right eye and the other in the lower back. Dr. Almeida was of the opinion that both of the gunshot wounds would have been fatal and that they were the cause of Mr. Babson's death.

SBI Agent Thomas Trochum, an expert in the field of forensic firearms identification and gunshot residue, examined the bullet that was removed from Mr. Babson's back and the bullet fragments that were removed from his head. Agent Trochum identified both as .44-caliber bullet jackets. The gun which Mr. Babson kept behind the counter in his store had been identified as a .38. In Agent Trochum's opinion, it is physically impossible to fire the .44-caliber bullet jackets that were found at the crime scene from a .38- or .357-type firearm.

Defendant presented no evidence during the guilt-innocence phase.

During the capital sentencing proceeding, the State presented additional evidence. The State sought to prove a continuing course of conduct on the part of defendant by introducing evidence of a prior murder. Barbara Hales Kinlaw testified that on 20 April 1994, she and her son found her mother, Lena Hales, sitting in her recliner unconscious. Ms. Kinlaw noticed that the entire side of her mother's face was black and blue and that she appeared to be badly beaten. Mrs. Hales subsequently died as a result of these injuries. Officer Edward Smith testified that on 26 April 1994, defendant made a statement in which he admitted that he broke into Mrs. Hales' home looking for money to buy drugs. He testified that Mrs. Hales retrieved her pock-

etbook from a closet and gave him all of the money that she had in it. Defendant told her not to yell, or he would come back and hurt her.

Dr. Deborah L. Radisch, the associate chief medical examiner for the State of North Carolina, testified that she performed the autopsy on Lena Hales. Dr. Radisch noted multiple bruising upon the head, neck, shoulder, chest, back, arms, and legs. Her internal examination revealed a bruising and swelling of the top of the scalp. In Dr. Radisch's opinion, Mrs. Hales' death was caused by a "blood clot over the brain due to a blunt trauma of the head."

Defendant also presented evidence during the sentencing proceeding. Roy Clark, a self-employed construction worker and minister for the Assemblies of God, testified that he had known defendant since defendant was a child. He stated that defendant had worked for him from 1988 to 1990, did quality work, and showed up for work reliably. Mr. Clark became aware defendant had a drug problem in 1992. He counseled defendant concerning the drug problem on three or four occasions over the next two years. Mr. Clark stated that he had never seen defendant engage in violent activities toward any person before the week of the killings.

Jimmy Bullard testified that he was a carpenter and a pastor involved in a prison ministry. Defendant had told Mr. Bullard that he was addicted to cocaine and that he was trying to quit. In Mr. Bullard's opinion, defendant would not have committed the offenses if he had not been using cocaine.

Sally Locklear Cummings, defendant's mother, testified that defendant was a normal, active boy when he was growing up. She further testified that defendant made his living by doing construction work from the time of his discharge from the Army until his arrest for these offenses. She stated that defendant supported his family and has a loving relationship with his children.

Daniel Cummings, Sr., defendant's father, testified that he and defendant were close when defendant was growing up. Mr. Cummings further testified that in 1992 he became aware defendant had a drug-abuse problem. Mr. Cummings stated that on the Sunday before the murder, defendant acknowledged that he needed help with his drug problem. Until the commission of these offenses, Mr. Cummings did not know of defendant's ever being violent.

Dr. John Warren, a licensed psychologist, testified that he conducted an evaluation of defendant consisting of psychological testing

and examination of available records concerning defendant's background. Dr. Warren testified that defendant's intellectual functioning falls within the borderline range of the ninth to thirteenth percentile and that his level of mental functioning falls between the mentally retarded and the low-average range of functioning. Based on his examination, it was Dr. Warren's opinion that defendant's thinking ability and behavior suffer because of his limited intellect. Dr. Warren further concluded that at the time of the offense, defendant suffered from acute cocaine intoxication as well as borderline intellectual functioning.

Daniel Richard Cummings, defendant's eight-year-old son, testified that he and his father got along pretty well. He stated that they would go to "the mountains and . . . the race track." He further testified that he went to Florida and out to eat with his father.

## JURY SELECTION ISSUES

### I.

Defendant's first assignment of error concerns the trial court's instructions to the jury. Defendant argues that the trial court improperly denied his motion for jury selection instructions and that the instructions given to the jury improperly shifted the burden of proof to defendant to gain a unanimous verdict on Issue Three of the sentencing instructions. In Issue Three, the jurors must answer the following question: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found?"

[1] First, we will address defendant's argument that the trial court improperly denied his motion for jury selection instructions. Defendant requested that the trial court remind the jurors that the presumption of innocence remained in place, even though they would be asked questions concerning the possible sentencing phase. The court in a capital case is not required to give any instructions other than those mandated by statute. *See State v. Payne*, 337 N.C. 505, 448 S.E.2d 93 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 292 (1995). N.C.G.S. § 15A-1213 requires that prior to the selection of jurors, the trial judge inform the prospective jurors

as to each defendant, of the charge, the date of the alleged offense, the name of any victim alleged in the pleading, the defendant's plea to the charge, and any affirmative defense of

which the defendant has given pretrial notice as required by Article 52, Motions Practice. The judge may not read the pleadings to the jury.

N.C.G.S. § 15A-1213 (1988).

Here, the trial court instructed the jury as statutorily required. Nothing in the statute requires the court to instruct prospective jurors concerning the presumption of innocence. "The purpose of the informative statement by the court to the prospective jurors is a limited one." *Payne*, 337 N.C. at 518, 448 S.E.2d at 100. The official commentary to the statute states that the "procedure is designed to orient the prospective jurors as to the case." N.C.G.S. § 15A-1213. The court properly fulfilled its statutory duty to orient the venire to the case and did not err by denying defendant's motion. We also note that, at the appropriate time, the trial court correctly instructed the impaneled jurors of defendant's presumption of innocence.

[2] We next address defendant's contention that the trial court's instructions improperly shifted the burden of proof to defendant to gain a unanimous verdict on Issue Three of the sentencing instructions. The instructions given to the prospective jurors included the following:

Then it will be the duty of the jury to retire and deliberate and recommend to the court whether the defendant should be sentenced to death or to life imprisonment. Your recommendation will be binding upon the court. If the jury unanimously recommends that the defendant be sentenced to death, the court will be required by law to impose a sentence of death. If the jury unanimously recommends a sentence of life imprisonment, the court will be required to impose a sentence of imprisonment in the State's prison for life.

The trial court further stated that at the penalty phase of the trial, the jury would be required to decide four things:   .

First, whether the State has proved beyond a reasonable doubt the existence of any aggravating circumstances. Second, whether the defendant has shown the existence of any mitigating circumstances. Third, whether the State has proven beyond a reasonable doubt that any mitigating circumstances the jury has found are insufficient to outweigh aggravating circumstances the jury has found. Fourth, whether the State has proved beyond a reasonable doubt that the aggravating circumstances the jury has found are

sufficiently substantial to call for the imposition of the death penalty when considered with any mitigating circumstances the jury has found.

Defendant objected to "the portions of [the] charge that had tended to show a burden on the defendant to prove mitigating circumstances, specifically where [the trial court] talked about the four matters that were put to the jury by [its] verdict."

Here, the instructions given by the trial court during the jury selection were a correct statement of the law. The jury is required to reach a unanimous verdict on its sentencing recommendation regardless of whether it is death or life imprisonment. N.C.G.S. § 15A-2000(b) (Supp. 1996). Further, the trial court correctly stated the four issues put before the jury during the penalty phase of the trial. In examining the instructions given by the court to the jury, they must be viewed contextually. *State v. Lynch,* 340 N.C. 435, 464, 459 S.E.2d 679, 693 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 558 (1996). In the present case, after the jury instructions were given, the trial court reminded the jurors that the instructions they had received were not the entire law, but were simply a short statement of the procedure. Further, when the jurors retired for deliberations, they were given complete instructions on the sentencing procedure. These instructions emphasized that only one or more of the jurors is required to find a mitigating circumstance before that juror is allowed to consider it. The trial court's instructions were accurate statements of the law and in no way shifted the burden of proof to defendant to gain a unanimous verdict on Issue Three of the sentencing instructions. This assignment of error is without merit.

## II.

[3] Next, defendant contends that the trial court erred in overruling defendant's objection to the peremptory challenge of prospective juror Alfredia Brown. Defendant argues that this challenge was based upon the prospective juror's race in violation of *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69 (1986); the Equal Protection Clause of the Fourteenth Amendment; and Article I, Section 26 of the North Carolina Constitution. We do not agree.

A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. *Hernandez v. New York,* 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, defendant must establish a *prima facie* case that

the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*

In the present case, defendant objected to the excusal of prospective juror Brown. The trial court then found that there had not been a *prima facie* showing of purposeful discrimination by the State and denied the *Batson* objection. Although the trial court did not require the prosecutor to give his reasons for exercising the peremptory challenge, the prosecutor volunteered the following five reasons: (1) Brown expressed hesitancy concerning her ability to be a part of the process of imposing the death penalty, (2) Brown knew an individual with whom the State was familiar, (3) Brown knew an individual who was involved in a drug-related shooting, (4) Brown had a friend with a substance-abuse problem and was hesitant about disclosing her relationship with that person, and (5) Brown lived in an area known to the prosecutor to be a place where the sale of controlled substances regularly occurs.

In *State v. Robinson*, 330 N.C. 1, 409 S.E.2d 288 (1991), the State also volunteered its reasons for excusal and this Court stated:

> We find it unnecessary to address the trial court's conclusion that defendant failed to make a prima facie case of discrimination because in this case the State voluntarily proffered explanations for each peremptory challenge. Given that the purpose of the prima facie case is to shift the burden of going forward to the State, there is no need for us to examine whether defendant met his initial burden. *See United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989)[;] *United States v. Woods*, 812 F.2d 1483, 1487 (4th Cir. 1987). We proceed, therefore, as if the prima facie case had been established.

*Robinson*, 330 N.C. at 17, 409 S.E.2d at 296. Similarly, in the present case, we need not address whether defendant has established a *prima facie* case of discrimination. Thus, the issue remaining is whether the trial court correctly determined that the prosecutor had not intentionally discriminated. *State v. Thomas*, 329 N.C. 423, 430-31, 407 S.E.2d 141, 147 (1991).

In order to rebut a *prima facie* case of discrimination, the prosecution must "articulate legitimate reasons which are clear and rea-

sonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). These reasons " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). Peremptory challenges may be exercised on the basis of " 'legitimate "hunches" and past experience[,]' so long as there was an absence of racially discriminatory motive." *State v. Jones*, 339 N.C. 114, 140, 451 S.E.2d 826, 839 (1994) (quoting *Porter*, 326 N.C. at 498, 391 S.E.2d at 151), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 873 (1995). Because the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error. *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412.

Applying these principles, we now examine the prosecutor's reasons for peremptorily challenging prospective juror Brown. First, the prosecutor stated that Brown expressed hesitancy concerning her ability to be a part of the process of imposing the death penalty. During the prosecutor's questioning of Brown, the following exchange took place:

Q. Ms. Brown, based on the questions that have been put to you thus far, has it given you an opportunity to examine where it is that you actually stand as it relates to any opposition to the death penalty?

[DEFENSE COUNSEL]: JUDGE, OBJECTION.

THE COURT: OVERRULED, YOU MAY ANSWER.

A. Well, I don't think I really have a problem with the death penalty but I just have a problem with being a part of the death penalty. That's what I have a problem with, being a part.

Q. Being part of the process[?]

A. Process, giving somebody the death penalty. I have a problem with that, that's what——

Q. Can you tell me what, what——

A. It's not that I don't believe in the death penalty, I just have a problem with being part of, you know——

Q.  All right. As to being a member of the jury and having to vote in an appropriate case for the death penalty, is that what you're having a problem with?

A.  Yeah, I mean, me personally, I just wouldn't want to be one of the members that would, you know, that's what I have a problem with. But [as far] as believing in the death penalty, I don't have a problem with that, you know.

Reservations of a juror concerning his or her ability to impose the death penalty constitute a racially neutral basis for exercising a peremptory challenge. *State v. Basden*, 339 N.C. 288, 297, 451 S.E.2d 238, 242-43 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 845 (1995). Brown's answers clearly established that she was not sure if she could vote to impose the death penalty, despite the fact that she had no moral or religious beliefs in opposition to it.

The final four reasons enunciated by the prosecutor all involve the juror's knowledge of persons and places related to controlled substances and crimes of violence. This Court has held that a prosecutor may exercise peremptory challenges in order to select a jury that is " 'stable, conservative, mature, government[-]oriented, sympathetic to the plight of the victim, and sympathetic to law enforcement crime solving problems and pressures.' " *Porter*, 326 N.C. at 498, 391 S.E.2d at 151 (quoting *Jackson*, 322 N.C. at 257, 368 S.E.2d at 841). This Court has also recognized that, although there is a potential for abuse for giving this reason, a prosecutor may exercise a peremptory challenge to excuse a juror who lived in a bad neighborhood where the record fails to reveal any discriminatory intent. *State v. Williams*, 339 N.C. 1, 452 S.E.2d 245 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 61 (1995).

Based on the reasons given by the prosecutor, which are supported by the record, and based on the entire jury selection process, we conclude that the State has met its burden of coming forward with neutral, nonracial explanations for this peremptory challenge. Thus, the excusal of prospective juror Brown was not racially motivated and is not clearly erroneous. Accordingly, this assignment of error is overruled.

### III.

[4] Defendant next contends that the trial court erred in excluding a prospective juror for cause when the prospective juror stated that he would follow the capital sentencing scheme, but would choose life

imprisonment over death. Defendant argues that the excusal of this juror violated defendant's constitutional right to a fair and impartial jury and a reliable sentencing hearing under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, 24, and 27 of the North Carolina Constitution. We disagree.

During the prosecutor's *voir dire* of prospective juror William Bland, the juror stated that if he had a choice between life imprisonment and death, he would always vote for life imprisonment:

Q. All right, sir. What I'm trying to determine is that if you would always do that regardless of the facts of the case, given the two choices, that regardless of the facts and the circumstances of the case, and regardless of how the judge instructed you, that based on your conscience, your belief and opposition to the death penalty, that you would always vote for life imprisonment?

A. Yes.

Q. All right. And in every case? And that you would always[,] in every case[,] reject the death penalty. Is that correct?

A. I can't take any middle roads here so, yes, I'd take the life imprisonment.

Q. All right, sir.

After this exchange, the prosecutor challenged prospective juror Bland for cause. Defendant then objected to Bland's excusal and requested the opportunity to rehabilitate him. The trial court denied defendant's motion and elected to question Bland itself:

Q. Okay and what I'm trying to determine[,] if you can answer it, would you automatically vote against capital punishment in this case and in any other case?

A. Yes, sir.

Q. Is your view or opposition to the ·death penalty such that it would prevent or substantially impair your ability to perform your sworn duties as a juror?

A. I could perform my duties, yes.

Q. Would you be able to perform those duties in reference to making a decision on whether to recommend life imprisonment or the death penalty?

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

A. I'd still have to go with life imprisonment.

Q. And if you were instructed during the course of this trial that you were to consider both life imprisonment and the death penalty, could you do that?

A. I could consider it, yes, sir, but you mean given a choice, right?

Q. Yes, sir. If given the choice, you'd automatically vote for life imprisonment without regard to the facts or circumstances in the case, is that what you're saying?

A. Yes, sir. If I'm given the decision to vote on one or the other in reference to a defendant, yes.

Q. Regardless of the facts or circumstances, you would never vote to recommend the death penalty, is that what you're saying?

A. That's what I said, yes, sir.

Subsequently, the trial court excused Bland for cause.

Prospective jurors in a capital case must be able to state clearly that " 'they are willing to temporarily set aside their own beliefs [concerning the death penalty] in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986)). The standard for determining whether a prospective juror may properly be excused for cause for his views on capital punishment is whether those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). The decision to excuse a juror is within the discretion of the trial court because "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425-26, 83 L. Ed. 2d at 852.

In the present case, an examination of the questioning of Bland on *voir dire* indicates that the trial court properly excused him for cause. Bland stated that he was opposed to the death penalty on "more religious [beliefs] than anything else." He stated that he would automatically vote against the death penalty if given a choice

between life imprisonment and death. When asked if he would reject the death penalty in every case, Bland replied, "I can't take any middle roads here so, yes, I'd take the life imprisonment."

**[5]** Further, the trial court did not abuse its discretion by refusing to allow defendant the opportunity to rehabilitate Bland. It is not an abuse of discretion for the trial court to deny defendant an attempt to rehabilitate a juror unless defendant can show that further questions would have produced different answers by the juror. *State v. Davis*, 340 N.C. 1, 19, 455 S.E.2d 627, 636, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 83 (1995). Bland clearly stated his position on the death penalty. The trial court extensively questioned Bland concerning his beliefs about the death penalty, and defendant has failed to show that any further questioning on his part would have resulted in a different answer. This assignment of error is without merit.

## GUILT-INNOCENCE PHASE

## IV.

**[6]** Next, defendant contends that the trial court committed plain error by failing to suppress *ex mero motu* defendant's confessions. Defendant argues that these confessions were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution.

On 14 November 1994, a suppression hearing was held concerning six confessions defendant made to law enforcement officers between 23 April 1994 and 28 April 1994. Defendant argued that the confessions were not voluntary because he was suffering from cocaine withdrawal at the time the statements were made, and therefore, he was unable to understand his *Miranda* rights. On appeal, defendant now asserts that the statements should have been suppressed because the confessions were obtained while defendant was in custody and was transported between three venues without being taken before a magistrate, without appointment of counsel, and without a first appearance in Brunswick County.

Defendant alleges this error for the first time on appeal under the plain error rule, which holds that errors or defects affecting substantial rights may be addressed even though they were not brought to the attention of the trial court. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). This Court has elected to review such unpreserved issues for plain error when Rule 10(c)(4) of the Rules of

Appellate Procedure has been complied with and when the issue involves either errors in the trial judge's instructions to the jury or rulings on the admissibility of evidence. *State v. Gregory*, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to the appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings . . . ."

*Odom*, 307 N.C. at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). However, this is not the exceptional case where, after reviewing the entire record, it can be said that the claimed error is so fundamental that justice could not have been done.

Specifically, defendant points to chapter 15A of the North Carolina General Statutes and N.C.G.S. § 7A-453 as support for his contention that his statutory rights were violated. Chapter 15A requires an appearance before a magistrate without unnecessary delay. N.C.G.S. § 15A-511(a) (1988). At the initial appearance, the magistrate must inform the defendant of: (1) the charges against him, (2) his right to communicate with counsel and friends, and (3) the general circumstances under which he may secure release. N.C.G.S. § 15A-511(b). A defendant who is arrested for a felony and cannot obtain pretrial release must be afforded a first appearance before a district court judge within ninety-six hours. N.C.G.S. § 15A-601 (Supp. 1996). To avoid delay between arrest and appointment of counsel, N.C.G.S. § 7A-453(b) provides: "In counties which do not have a public defender, the authority having custody of a person who is without counsel for more than 48 hours after being taken into custody shall so inform the clerk of superior court."

In further support of his contention, defendant cites several cases which discuss the failure of law enforcement officers to seek a probable cause determination after arresting defendant without a warrant. In *Gerstein v. Pugh*, 420 U.S. 103, 43 L. Ed. 2d 54 (1975), the

United States Supreme Court held that a defendant who is arrested without a warrant is entitled to a prompt determination of probable cause by a judicial official. The Court later defined "prompt" as generally being within forty-eight hours. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63 (1991). If there is a delay in taking defendant before the magistrate for that determination, the prosecution may demonstrate the existence of an extraordinary circumstance to justify the delay. *Id.* However, because defendant was not arrested for Babson's murder without a warrant, these cases are not applicable to the case at bar.

Here, the issue is whether the confessions relating to the murder of Babson should have been suppressed. On three separate occasions prior to his arrest and detention in Brunswick County, defendant made statements in relation to this murder. Prior to making each statement, defendant was read his *Miranda* rights and voluntarily signed a waiver of these rights. On appeal, defendant does not contest the procedural process used to obtain these statements, but instead contends that there was undue delay in transporting him to Brunswick County for the purpose of charging him with the murder of Babson and in administering the mandatory statutory procedures involved once a defendant has been charged and detained for a criminal offense. We note that when a defendant has multiple charges pending against him involving several different jurisdictions, it is not possible for the defendant to be taken immediately to every jurisdiction. Defendant cites no authority for the proposition that statements made regarding crimes committed in another jurisdiction should be suppressed if he has yet to be detained in that jurisdiction. Defendant's only authority involves the mandatory statutory procedures of chapter 15A of the North Carolina General Statutes, which are required once a defendant has been charged and is in custody, and cases in which law enforcement officers failed to seek a probable cause determination after arresting defendant without a warrant.

Here, defendant was not arrested for the murder of Babson without a warrant. From the record, it is clear that defendant was arrested for possession of a stolen vehicle in Sampson County at approximately 1:00 p.m. on 23 April 1994. Defendant was not arrested for the murder of Babson until 28 April 1994, although he was in custody on other charges. From the record, the earliest that Detective Hunter could have developed probable cause to arrest defendant was during an interview conducted on 24 April 1994. The warrant for

defendant's arrest was issued on 25 April 1994, and defendant was arrested for the Brunswick County murder on 28 April 1994. On that same day, defendant had a first appearance before a district court judge, and an attorney was appointed to represent him on the Babson murder charge. This complied with both the statutory and constitutional requirements. Additionally, the record reflects that defendant made yet another statement to law enforcement officers concerning the Babson murder after the mandatory statutory procedures had been carried out in Brunswick County.

Based on the above analysis, it is clear that defendant has failed to demonstrate that any violation of his constitutional or statutory rights has occurred. Accordingly, this is not the exceptional case where, after reviewing the entire record, it can be said that the claimed error is so fundamental that justice could not have been done. This assignment of error is overruled.

## V.

[7] In a related assignment of error, defendant contends that the trial court erred by failing to suppress his confessions because they were obtained after a law enforcement officer "chilled defendant's exercise of his right to counsel." Defendant argues that the statements made to him by Detective Hunter concerning the possibility that he may have to pay the State for his lawyer violated the requirements of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). He further asserts that the taint of the alleged error in the *Miranda* warnings was not cured as to the two subsequent statements that were made to Detective Hunter and that those statements should likewise have been suppressed. We again do not agree.

On 24 April 1994, defendant was interviewed by Detective Hunter and SBI Agent Storms at approximately 6:00 p.m. Prior to the interview, Detective Hunter advised defendant of his *Miranda* rights. While advising defendant of his rights, Detective Hunter marked out the words "at no cost" in sentence number four, which read, "If you want a lawyer before or during questioning but cannot afford to hire one, one will be appointed to represent you *at no cost* before any questioning." (Emphasis added.) Detective Hunter explained to defendant, "I don't know why they put in this at no cost. If you are found innocent, it is no cost[,] but if you are found guilty[,] there is a chance the state will require you to reimburse them for the attorney fees." Detective Hunter then explained that he "was going to cross it off and initial it because [he] didn't want to mislead [defendant]."

After this conversation, defendant made a statement to Detective Hunter that was admitted into evidence during the trial.

When a person is subjected to custodial interrogation by law enforcement officers,

> "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently."

*State v. Ingle*, 336 N.C. 617, 634, 445 S.E.2d 880, 888 (1994) (quoting *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706-07), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995).

> *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admissibility of any statement made by a defendant."

*California v. Prysock*, 453 U.S. 355, 359-60, 69 L. Ed. 2d 696, 701 (1981) (quoting *Miranda*, 384 U.S. at 476, 16 L. Ed. 2d at 725).

The rights read by Detective Hunter to defendant on 24 April 1994 constituted a fully effective equivalent of the *Miranda* rights. *Miranda* does not require that the officer inform an indigent defendant that an attorney would be appointed for him at no cost. All that is required is that the defendant be informed that an attorney will be appointed for him before questioning, if he so desires. *Miranda*, 384 U.S. at 479, 16 L. Ed. 2d at 726. Detective Hunter effectively informed defendant of this right.

Further, the additional information supplied by Detective Hunter to defendant was accurate. Under North Carolina law, indigents are entitled to court-appointed counsel whenever they are involved in adversarial proceedings that jeopardize their liberty interests. N.C.G.S. § 7A-451 (Supp. 1996). Legal assistance is unconditional once indigency is established, although the State reserves to itself a general lien against defendant's future earnings if defendant is convicted and should later become able to pay. N.C.G.S. § 7A-455 (1995).

Informing defendant that he may be required to reimburse the State for the costs of his attorney also does not "chill" his right to have counsel provided. In *Fuller v. Oregon*, 417 U.S. 40, 40 L. Ed. 2d 642 (1974), the United States Supreme Court addressed the issue of whether the requirement of repayment of attorney's fees in some circumstances would "chill" the defendant's right to counsel by possibly compelling him to decline counsel to avoid the possibility of repayment. In finding the Oregon recoupment statute, which is very similar to North Carolina's statute, constitutional, Justice Stewart stated:

> Unlike the statutes found invalid in those cases where the provisions "had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them," [*United States v. Jackson*, 390 U.S. 570,] 581, 20 L. Ed. 2d 138, [147 (1968),] Oregon's recoupment statute merely provides that a convicted person who later becomes able to pay for his counsel may be required to do so. Oregon's legislation is tailored to impose an obligation only upon those with a foreseeable ability to meet it, and to enforce that obligation only against those who actually become able to meet it without hardship.

*Fuller*, 417 U.S. at 54, 40 L. Ed. 2d at 655.

Detective Hunter correctly stated the law when he informed defendant that, under certain circumstances, sometime in the future he may be required to reimburse the State for his attorney. The warnings given by Detective Hunter to defendant complied with the mandate of *Miranda*, and accordingly, this assignment of error is overruled.

## VI.

[8] Defendant further contends that the trial court erred by allowing speculative testimony concerning whether the victim was killed during the course of a struggle. Specifically, defendant assigns as error the testimony of Babson's son, Ronnie Babson, and Dr. Almeida, the pathologist who performed the autopsy on Babson. Defendant contends that the admission of this testimony violated his statutory and constitutional rights. We disagree.

After being qualified as an expert in the field of forensic pathology, Dr. Almeida testified as follows:

Q. Do you have an opinion as to the cause of death of Mr. Babson?

A. Yes, I do.

Q. And what is that opinion?

A. That he died from a gunshot wound to the head and to the back.

Q. Now, as to the wound to the back, in describing the tract, were you able to determine how Mr. Babson would have been—where he would have been located when that wound would have been inflicted?

  MR. FAIRLY [DEFENSE COUNSEL]: OBJECTION.

  MR. RAMOS [DEFENSE COUNSEL]: OBJECTION, NO FOUNDATION.

  THE COURT: THE OBJECTION IS OVERRULED.

A. I cannot say where he was located. I can say that that is a very acute angle fired from the area of the feet.

Q. Doctor, acute angle, what do you mean by that?

A. It entered low on the back, went through and exited right here. The shot had to be fired from the feet.

  MR. RAMOS: OBJECTION TO WHERE THE SHOT HAD TO BE FIRED FROM.

  THE COURT: THE OBJECTION IS OVERRULED.

Q. Do you have an opinion as to how the body would have been located when that shot would have been fired?

A. The shot had to come from below the feet. Mr. Babson would have had to have been above the person that fired the shot or on the ground.

Q. When you say he would either have been above—

A. Standing above him.

Q. And the person shooting up?

A. Or the person that was shooting was on the ground.

Q. Or the person shooting down in order to get that acute angle?

A. Correct.

On redirect, Dr. Almeida testified, over objection, that the wound in the back was consistent with Mr. Babson's leaning over, lying in a chair when shot.

Defendant contends that the expert's opinions should have been excluded under both Rules 401 and 403 of the Rules of Evidence. Defendant notes that the witness admitted on direct examination that he could not say where the victim was located when he was shot, but then on redirect testified that the wound in the back was consistent with Mr. Babson's leaning over, lying in a chair when shot. Defendant argues that this testimony was prejudicial, as it left the jury with the impression that the victim was shot while sitting in his chair.

Rule 401 provides that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Relevant evidence may be excluded by the court if its probative value is substantially outweighed by its prejudicial effect. N.C.G.S. § 8C-1, Rule 403 (1992). Whether to exclude evidence pursuant to Rule 403 is within the sound discretion of the trial judge. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986).

On direct examination, Dr. Almeida testified that he had no opinion as to where Mr. Babson had been located at the time that he was shot. This testimony was directed at the fact that Dr. Almeida had not viewed the crime scene and, thus, could not know where Mr. Babson was at the time that he was shot. However, he did have an opinion concerning the direction from which the bullets were fired and the possible position of the victim. An expert opinion is admissible if the witness " 'is in a better position to have an opinion . . . than is the trier of fact.' " *State v. Saunders*, 317 N.C. 308, 314, 345 S.E.2d 212, 216 (1986) (quoting *State v. Wilkerson*, 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978)). Dr. Almeida, as the pathologist who performed the autopsy of Mr. Babson, was in the best position to assist the jury in understanding the angles of the wounds and determining whether the angles of the wounds were consistent with circumstances at the crime scene. *State v. Ali*, 329 N.C. 394, 415, 407 S.E.2d 183, 196 (1991). Therefore, the trial court did not err in admitting Dr. Almeida's testimony.

**[9]** We next address defendant's contention that the trial court erred in admitting the testimony of Ronnie Babson, the son of the victim. Ronnie Babson testified that he had given his father a .38-caliber

"police special," which was kept under a towel by the cash register. He also testified his father was right-handed and that his right little finger had been removed. The State's last question to Babson was as follows:

Q. Were you familiar with whether or not your father had much strength in that particular hand?

A. Very little.

    [DEFENSE COUNSEL]: OBJECTION.

    THE COURT: OVERRULED.

Q. Do you recall whether or not he had much strength in his right hand?

A. Very little.

Defendant contends that the court's denial of defendant's objection left the jury with the perception of an elderly man unable to hold a pistol. Defendant argues that because of the speculative nature of this testimony, the probative value of the testimony was substantially outweighed by the danger of unfair prejudice.

A witness may testify to matters within his personal knowledge if there is sufficient evidence to show that he has personal knowledge of the facts. N.C.G.S. § 8C-1, Rule 602 (1992). In the present case, there was ample evidence in the record to support the finding that Ronnie Babson had personal knowledge of his father's physical condition. Ronnie Babson had operated a business next door to his father's store and home for approximately six years prior to the murder of his father. He had constant contact with his father and was familiar with where his father kept items in the store.

Further, defendant told the officer that he shot Babson as they struggled over a gun which Babson had attempted to use to protect himself from defendant's robbery attempt. Ronnie Babson's testimony was relevant to the ability of Babson to have armed himself with a weapon and to have attempted to shoot defendant. The testimony established that the victim was an elderly man who had difficulty holding a pistol. This testimony also served to impeach the partially self-serving confessions of defendant. The trial court did not abuse its discretion by allowing the introduction of this testimony. Accordingly, this assignment of error is without merit.

## VII.

**[10]** Next, defendant contends that the trial court erred by allowing the testimony of an SBI agent concerning the caliber of the bullets found in the victim's store and in his body. Defendant contends that he had not received the results of the agent's examination prior to his testimony. Defendant argues that this expert evidence was procured in violation of discovery rules and should not have been heard by the jury. Defendant contends that the admission of this testimony violated his statutory and constitutional rights. We do not agree.

SBI Agent Thomas Trochum testified as an expert in the field of firearms identification. Over defendant's objection, the trial court allowed Agent Trochum to testify concerning his examination of bullets from the crime scene. He testified that the bullets which were removed from the wall in Mr. Babson's store and from Mr. Babson's body were .44-caliber bullets. He also testified that the bullets removed from the wall and from Babson's body had been fired from the same firearm. He concluded that the bullets which were recovered from the crime scene could not have been fired from the .38-caliber weapon that Babson kept in his store.

The record reflects that defendant received notice of the evidence of which he now complains. In objecting to a diagram introduced at trial, the defense counsel stated:

We would object to the—I notice on there that it describes that particular illustration as a hollow-point jacketed bullet[.] I have the results of Mr. Trochum's analysis[,] and the only thing he can tell us, at least as far as from that[,] is that these were .44 bullet jackets and the lead fragments are unsuitable for microscopic comparison and, therefore, I guess he can't tell us whether it was a hollow[-]point or any other kind of point bullet[.]

The State has no statutory duty to provide discovery absent a request from defendant. N.C.G.S. § 15A-903 (1988). Nor is the State required to respond voluntarily to a request for discovery. *State v. Anderson*, 303 N.C. 185, 278 S.E.2d 238 (1981), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 251, 367 S.E.2d 639, 644 (1988). Here, defendant makes a reference to a request for voluntary discovery that the defense had served upon the State, but there is no such request in the record. The defendant has the responsibility to provide a complete record. N.C. R. App. P. 9. Because there is no order of discovery in the record and it is apparent defendant was

familiar with the evidence which was introduced during the trial, it was not error for the trial court to allow the introduction of this evidence.

Assuming, *arguendo*, that this testimony should have been excluded, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of defendant's guilt. *See* N.C.G.S. § 15A-1443(b) (1988); *State v. Eason*, 336 N.C. 730, 746, 445 S.E.2d 917, 927 (1994).

## VIII.

[11] Defendant next assigns as error the trial court's refusal to give defendant's requested instructions on the effect of the alleged struggle between defendant and the victim and the specific intent to kill. Defendant contends that the failure of the trial court to give his requested instructions violated his constitutional and statutory rights, and he is thus entitled to a new trial. We disagree.

At the close of the guilt-innocence phase, defendant submitted two jury instructions. Both instructions went to the issue of what evidence the jury should consider while deliberating on defendant's specific intent to kill the victim. The first instruction requested was as follows:

> The State introduced a statement into evidence purported to be the confession of the defendant. When the State introduces into evidence a defendant's confession containing exculpatory statements which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by the exculpatory statements.

The trial court declined to give this instruction. The second instruction requested by defendant was as follows:

> The specific intent to kill necessary to find a person guilty of first[-]degree murder based on premeditation and deliberation must arise from a fixed determination to kill previously formed after weighing the matter. If the killing was the product of a specific intent to kill formed under the influence of the provocation of a struggle itself, then there would be no deliberation and hence no murder in the first degree.

The trial court also declined to give this instruction, but instead used the pattern jury instruction to instruct on the elements of first-degree murder.

The trial court need only give a requested instruction which is supported by the evidence. *State v. Rose,* 323 N.C. 455, 458, 373 S.E.2d 426, 428 (1988). In *State v. Williams,* 308 N.C. 47, 301 S.E.2d 335, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177 (1983), this Court stated: "When the State introduces into evidence a defendant's confession containing exculpatory statements which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by the exculpatory statements." *Id.* at 66, 301 S.E.2d at 347.

Here, the requested instructions were not supported by the evidence. Defendant's confessions tended to show two versions of the killing. The 24 April 1994 statement tended to show that defendant was not present in the store when Babson was shot. The later statements tend to show that defendant went into the store unarmed, intending to rob Babson, and that Babson was shot accidentally when he pulled a gun on defendant and the two struggled over the weapon. This evidence was neither fully exculpatory nor uncontradicted. Accordingly, the trial court properly declined to instruct the jury that the State was bound by any exculpatory statements contained in defendant's confession.

[12] Further, the trial court did not err by refusing to give defendant's requested instruction on the specific intent to kill. Instead, the trial court elected to use the pattern jury instructions when instructing on the elements of first-degree murder:

Third, that the defendant intended to kill the victim. Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. An intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties and other relevant circumstances.

The instruction given by the trial court allowed the jury to consider the "nature of the assault, the manner in which it was made, the conduct of the parties and other relevant circumstances" in determining whether they were satisfied beyond a reasonable doubt that defendant intended to kill Babson. Whether defendant and Babson were involved in a struggle at the time of the killing is a determination to be made by the jury when considering the nature and manner of the assault. This instruction was in substantial conformity with the one requested by defendant, and the trial court did not err in giving this instruction rather than the one requested by defendant. *See State v. Monk,* 291 N.C. 37, 229 S.E.2d 163 (1976).

## IX.

**[13]** Next, defendant contends that the trial court erred by refusing to give defendant's requested instruction on the lesser included offenses of common law robbery and larceny with respect to the armed robbery charge. Defendant points to his own exculpatory statement as support for this contention. He argues that his statement could have "provided a factual basis by which a juror could have found the Defendant acquired a gun in a struggle with [the] victim and his conduct constituted a common law robbery." We disagree.

"Under N.C.G.S. § 14-87(a), robbery with a dangerous weapon is: '(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened.' " *State v. Olson*, 330 N.C. 557, 566, 411 S.E.2d 592, 597 (1992) (quoting *State v. Beaty*, 306 N.C. 491, 496, 293 S.E.2d 760, 764 (1982), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988)); *see* N.C.G.S. § 14-87 (1993). " 'Force or intimidation occasioned by the use or threatened use of firearms, is the main element of the offense.' " *State v. Beaty*, 306 N.C. at 496, 293 S.E.2d at 764 (quoting *State v. Mull*, 224 N.C. 574, 576, 31 S.E.2d 764, 765 (1944)).

We first address defendant's contention that the trial court erred by failing to instruct on the lesser included offense of common law robbery. We have held that where the uncontroverted evidence is positive and unequivocal as to each and every element of armed robbery, and there is no evidence supporting defendant's guilt of a lesser included offense, the trial court does not err by failing to instruct the jury on the lesser included offense of common law robbery. *State v. Peacock*, 313 N.C. 554, 562, 330 S.E.2d 190, 195 (1985). "The sole factor determining the judge's obligation to give such an instruction is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense." *State v. Wright*, 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981).

"The critical difference between armed robbery and common law robbery is that the former is accomplished by the use or threatened use of a dangerous weapon whereby the life of a person is endangered or threatened." *Peacock*, 313 N.C. at 562, 330 S.E.2d at 195. The use or threatened use of a dangerous weapon is not an essential ele-

ment of common law robbery. *State v. Moore*, 279 N.C. 455, 183 S.E.2d 546 (1971).

Here, the evidence is uncontradicted that the robbery was committed with the use of a deadly weapon. Whether defendant carried the gun into the store with him, or as he alleges, "acquired a gun in a struggle" is irrelevant. As we stated above, the critical difference between armed robbery and common law robbery is that the former is accomplished by the use or threatened use of a dangerous weapon. It is clear from the evidence before us that a dangerous weapon was actually used in the present case, not merely threatened. Additionally, the uncontradicted physical evidence did not support defendant's contention that a struggle occurred. The gun which Babson kept in his store was identified as a .38-caliber handgun. The bullets which killed Babson were fired from a .44-caliber weapon. We do not believe the evidence in this case would have convinced a rational trier of fact that defendant committed the lesser offense of common law robbery. Therefore, the trial court properly denied defendant's request for an instruction on the lesser included offense of common law robbery.

[14] Next, we address defendant's contention that the trial court erred by failing to instruct on the lesser included offense of larceny. Larceny is a lesser included offense of robbery with a dangerous weapon. *White*, 322 N.C. at 514, 369 S.E.2d at 817. "[T]here is a special relationship between armed robbery and larceny. Both crimes involve an unlawful and willful taking of another's personal property. We have said that armed robbery is an aggravated form of larceny." *Id.* at 516, 369 S.E.2d at 818.

"To convict of larceny, there must be proof that defendant (a) took the property of another; (b) carried it away; (c) without the owner's consent; and (d) with the intent to deprive the owner of his property permanently." *Id.* at 518, 369 S.E.2d at 819. However, as we have often stated, " '[a] trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that defendant committed the lesser included offense.' " *Id.* at 512, 369 S.E.2d at 816 (quoting *State v. Rhinehart*, 322 N.C. 53, 59, 366 S.E.2d 429, 432 (1988)). "The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting

evidence relating to any of these elements." *State v. Leroux*, 326 N.C. 368, 378, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990).

Applying the foregoing principles to the present case, we conclude that the State introduced substantial evidence of defendant's guilt of robbery with a firearm and that the trial court did not err by refusing to charge on the lesser included offense of larceny. The evidence presented provides ample support for finding that "defendant's use of the gun was so joined by time and circumstances to the taking as to make the use of the gun and the taking parts of one continuous transaction." *Olson*, 330 N.C. at 567, 411 S.E.2d at 597. In a statement made to law enforcement officers, defendant stated:

> I told the old man to, 'Give me your money'. The old man went towards the cash register and I thought he was going to get the money. The old man came back with a gun and shot at me. I crawled around the counter and we struggled over the gun. I believe I heard or counted about four shots that went off inside the store. I took the old man's wallet . . . . I did not see where the old man got shot. I got the money out of the cash register and left the old man laying face down in the chair.

Even assuming *arguendo* that defendant's version of what happened is accurate, the evidence is uncontradicted that a gun was used by defendant in accomplishing his stated purpose of robbing the victim. Thus, the trial court properly denied defendant's request to instruct on the lesser included offense of larceny. Accordingly, this assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

### X.

[15] Defendant contends that the trial court erred in the capital sentencing proceeding by admitting evidence of a prior unadjudicated murder to support the aggravating circumstance that the murder was part of a course of conduct which included the commission of other violent crimes. Defendant argues that the evidence presented was insufficient to prove defendant's guilt of the prior crime and was thus irrelevant, inflammatory, and unfairly prejudicial to defendant. Defendant contends that the submission of this evidence violated his federal and state constitutional rights to due process of law and freedom from cruel and unusual punishment. We do not agree.

Before presentation of the evidence in the sentencing phase of these proceedings, defendant filed a motion *in limine* to prohibit the introduction of evidence that defendant had broken into the home of Lena Hales on 19 April 1994 and had killed Hales during the course of a robbery. Defendant had been charged with the offense, but he had not been tried. The trial court denied defendant's motion and found that the evidence was probative on the issue of whether the killing of Babson was part of a course of conduct involving crimes of violence against others. Based on this evidence and the evidence that defendant had fired a gun at Mrs. Babson after killing her husband, the trial court submitted the statutory aggravating circumstance that "[t]he murder for which defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). Subsequently, the jury found that this aggravating circumstance did exist.

Submission of course of conduct requires that "there is evidence that the victim's murder and the other violent crimes were part of a pattern of intentional acts establishing that in defendant's mind, there existed a plan, scheme or design involving the murder of the victim and the other crimes of violence." *State v. Walls*, 342 N.C. 1, 69, 463 S.E.2d 738, 775 (1995), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 794 (1996). This Court has refused to require a conviction of the offense before the State may use that offense to establish the course of conduct aggravating circumstance. *See State v. Williams*, 305 N.C. 656, 292 S.E.2d 243 (course of conduct aggravator in defendant's conviction of a robbery-murder supported by evidence of a robbery-murder that was committed three hours later without any evidence of whether defendant was convicted of those offenses), *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982); *State v. Moseley*, 336 N.C. 710, 445 S.E.2d 906 (1994) (evidence of unadjudicated murder and rapes in another county that occurred three months before the murder for which defendant had been convicted admissible to support course of conduct aggravator), *cert. denied,* 513 U.S. 1120, 130 L. Ed. 2d 802 (1995).

In determining whether there is sufficient evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving all contradictions in favor of the State. *State v. Skipper*, 337 N.C. 1, 53, 446 S.E.2d 252, 281 (1994), *cert. denied,* 513 U.S. 1134, 130 L. Ed. 2d 895 (1995).

" 'If there is substantial evidence of each element of the [aggravating] issue under consideration, the issue must be submitted to the jury for its determination.' " *State v. Gregory*, 340 N.C. 365, 411, 459 S.E.2d 638, 664 (1995) (quoting *State v. Moose*, 310 N.C. 482, 494, 313 S.E.2d 507, 516 (1984)), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 478 (1996). In determining whether the evidence tends to show that another crime and the crime for which defendant is being sentenced were part of a course of conduct, the trial court must consider a number of factors, including the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons. *State v. Cummings*, 332 N.C. 487, 509, 422 S.E.2d 692, 704 (1992).

In the present case, there was sufficient evidence to warrant submission of the course of conduct aggravating circumstance to the jury. The evidence, when viewed in the light most favorable to the State, tended to show that defendant was seeking money to buy drugs when he broke into the home of Hales and that Hales was badly beaten. The evidence further showed that Hales died as a result of the beating and that the defendant inflicted the injuries which caused her death. A murder is a crime of violence that will support the course of conduct aggravating circumstance. *State v. Pinch*, 306 N.C. 1, 30, 292 S.E.2d 203, 225, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988).

Additionally, the evidence demonstrated that there was a sufficient link between the murders of Hales and Babson. First, both murders occurred within several days of each other. Second, the evidence showed that both murders were committed for the purpose of obtaining money for cocaine. Third, both incidents involved elderly victims. The evidence further showed that in the early morning hours, after the killing of Hales, defendant stole the van which he used to drive to Brunswick County to commit the murder of Babson. This was sufficient to support the conclusion that there existed in the mind of defendant a plan, scheme, system, or design involving the murders of both Babson and Hales. Accordingly, the trial court did not err in submitting this aggravating circumstance to the jury.

[16] Defendant further contends that the trial court erred by failing to give special instructions as to what conduct could be used in determining whether the course of conduct aggravating circumstance

existed. Defendant did not object to the trial court's instructions concerning the course of conduct aggravating circumstance. When defendant fails to object to a jury instruction at trial, the plain error standard is applied. *Odom*, 307 N.C. at 660, 300 S.E.2d at 378. To demonstrate plain error, defendant must show "that there was error, but that absent that error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

In the present case, defendant has failed to meet this burden. First, the instructions given by the trial court were a correct statement of the law. Second, in considering the course of conduct aggravating circumstance, the jury is required to determine whether the killing was part of a course of conduct in which defendant engaged and whether that conduct involved crimes of violence against another or others. *State v. Carter*, 338 N.C. 569, 451 S.E.2d 157 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 263 (1995). The fact that the jury did not specify which crimes constitute the violent crimes required for the finding of this aggravating circumstance does not render the verdict invalid. This Court has never required that the jury do so. *See State v. Price*, 326 N.C. 56, 81, 388 S.E.2d 84, 98 (1990). Thus, the trial court did not err in failing to instruct concerning what conduct could be used in determining whether the course of conduct aggravating circumstance existed.

**[17]** Finally, defendant contends that the trial court should have excluded the evidence concerning the details of Hales' murder, as "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." N.C.G.S. § 8C-1, Rule 403. However, the North Carolina Rules of Evidence do not apply in sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992). Any evidence the court "deems relevant to sentence" may be introduced at this stage. N.C.G.S. § 15A-2000(a)(3). The State "must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty." *State v. Brown*, 315 N.C. 40, 61, 337 S.E.2d 808, 824 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Thus, the trial court was not required to perform the Rule 403 balancing test. The evidence of the killing of Hales was relevant to prove the existence of the course of conduct aggravating circumstance. It was relevant not merely to show defendant had killed Mrs. Hales, but also to demonstrate his conduct in

committing that murder. Accordingly, this assignment of error is overruled.

## XI.

[18] Next, defendant contends that the trial court erred by refusing to instruct the jury that it did not need to be unanimous in order to answer "no" to Issues Three and Four on the "Issues and Recommendation as to Punishment" form. Defendant argues that the instruction given by the trial court prejudiced him by reducing the State's burden of proof, thereby depriving defendant of his federal and state constitutional rights. We disagree.

In the present case, the jury was instructed from the pattern jury instructions, and the jury was given the pattern written Issues and Recommendation as to Punishment form. As to Issue Three, the trial court instructed, "If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer Issue Three [']yes[']. If you do not so find or have a reasonable doubt as to whether they do, you would answer Issue Three [']no[']."

In *State v. McCarver*, 341 N.C. 364, 462 S.E.2d 25 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 482 (1996), this Court held that the trial court did not err by specifically instructing the jury that the answer to Issue Three needs to be unanimous regardless of whether the answer is "yes" or "no." "In a capital sentencing proceeding, any jury recommendation requiring a sentence of death or life imprisonment must be unanimous." *Id.* at 389, 462 S.E.2d at 39. As this Court has previously stated:

> Since the sentence recommendation, *if any*, must be unanimous under constitutional and statutory provisions, and particularly in light of the overwhelming policy reasons for a unanimity requirement, we conclude that any issue which is *outcome determinative* as to the sentence a defendant in a capital trial will receive—whether death or life imprisonment—must be answered unanimously by the jury. That is, the jury should answer Issues One, Three, and Four on the standard form used in capital cases either unanimously "yes" or unanimously "no."

*Id.* at 390, 462 S.E.2d at 39.

Further, in *McCarver*, the jury sent a written inquiry to the trial court regarding Issue Three. The note read, "Must there be twelve

votes, 'Yes,' or twelve votes, 'No,' to reach a unanimous decision?" *Id.* at 389, 462 S.E.2d at 39. Here, the jury never inquired about the unanimity requirement, and the trial judge was not required to give any additional instructions. Thus, the trial court did not err in instructing the jury as to Issue Three.

Further, the trial court did not err in instructing the jury as to Issue Four. In the present case, the trial court instructed the jurors that "each juror may consider any mitigating circumstance or circumstances that juror determined to exist by a preponderance of the evidence." This Court has previously decided this issue contrary to defendant's position in *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994), and we see no reason to overturn that decision now. Accordingly, we find no merit to this assignment of error.

## PRESERVATION

## XII.

Defendant raises eight additional issues which he concedes have been decided contrary to his position previously by this Court: (1) the trial court erred in denying defendant's motion to strike the death penalty on the ground it is unconstitutional; (2) the trial court committed reversible error by denying defendant's motion to have a bifurcated jury thereby violating defendant's statutory and constitutional rights; (3) the trial court erred by denying defendant's motion to preclude the prosecution from using peremptory challenges to strike jurors who indicated uncertainty about the death penalty or jurors who were struck because of sex, color, race, religion, or national origin; (4) the trial court erred by denying defendant's motion to allocute and thereby violated defendant's statutory and constitutional rights; (5) the trial court erred by submitting the pecuniary gain aggravating circumstance to the jury because it was not in accordance with the law and the evidence and by not allowing defendant's motion to set aside the death sentence for lack of evidence, thereby violating defendant's statutory and constitutional rights; (6) the trial court erred by refusing to submit defendant's final instruction and overruling defendant's objection to language requiring the jury to enter a death verdict after answering Issue Four "Yes," thereby violating defendant's statutory and constitutional rights; (7) the trial court committed reversible error by refusing defendant's request for instructions on Issue Three and Four and thereby violated defendant's statutory and constitutional rights; and (8) the trial court

erred by refusing to give defendant's requested parole eligibility instruction, thereby violating defendant's statutory and constitutional rights.

Defendant raises these issues for purposes of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[19] Having found no error in either the guilt-innocence or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and also under the felony murder rule. The jury found the aggravating circumstances that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), and that the murder was part of a course of conduct including other violent crimes, N.C.G.S. § 15A-2000(e)(11). We conclude that the evidence supports each aggravating circumstance found. We further conclude, based on a thorough review of the record, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Williams*, 308 N.C. at 79, 301 S.E.2d at 355; *accord* N.C.G.S. § 15A-2000(d)(2). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court."

*State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum,* 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the cases in which we have found the death penalty to be proportionate. *Id.* Although we review all of these cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.*

This case is distinguishable from the cases in which this Court has found the death penalty disproportionate and entered a sentence of life imprisonment. In three of those cases, *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983), the defendant either pled guilty or was convicted by the jury solely under the theory of felony murder. Here, defendant was convicted on the theory of malice, premeditation, and deliberation and also the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, the seventy-four-year-old victim would have been no match for the physical strength of defendant, a healthy thirty-nine-year-old man.

We recognize that juries have imposed sentences of life imprisonment in several cases which are similar to the present case. However, "the fact that one or more cases is factually similar to the one under review, in which juries have recommended life imprisonment, is not determinative, standing alone, on the issue of whether the death penalty is disproportionate in the case under review." *Green,* 336 N.C. at 198, 443 S.E.2d at 47. Our review of such cases reveals that they are distinguishable and do not render the sentence of death in this case disproportionate.

Defendant argues that his sentence is disproportionate for several reasons, including: (1) the jury found twenty-eight of the thirty-two mitigating circumstances submitted, and (2) defendant's remorsefulness. The number of mitigating circumstances does not suffice to render a death sentence disproportionate. Even a "single

STATE v. CUMMINGS

[346 N.C. 291 (1997)]

aggravating circumstance may outweigh a number of mitigating circumstances and . . . be sufficient to support a death sentence." *State v. Bacon*, 337 N.C. 66, 110, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

Further, we do not find defendant's alleged remorsefulness a persuasive argument in conducting our proportionality review. Defendant states that "[t]his Court has placed great weight on remorse in previous proportionality reviews." However, there is little evidence in the record that defendant expressed remorse concerning the murder of Mr. Babson. In *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983), this Court discussed the defendant's remorsefulness in determining that the sentence of death was disproportionate. However, *Bondurant* is distinguishable from the present case.

In *Bondurant*, the defendant immediately exhibited remorse and concern for the victim's life by directing the driver of the vehicle to go to the hospital. The defendant also went into the hospital to secure medical help for the victim, voluntarily spoke with police officers, and admitted to shooting the victim. In the present case, by contrast, the defendant shot the victim several times and left the victim lying helplessly on the floor. The defendant did not seek medical aid for the victim and instead stole money from the victim in order to buy drugs. Further, defendant immediately fled the scene.

After reviewing the cases, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment. Therefore, the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

Having considered and rejected all of defendant's assignments of error, we hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. Comparing this case to similar cases in which the death penalty was imposed and considering both the crime and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. Therefore, the sentence of death entered against defendant must be and is left undisturbed.

NO ERROR.