Daniel CUMMINGS, Jr., Petitioner–
Appellant,

v.

Marvin POLK, Warden, Central Prison, Raleigh, North Carolina; Roy Cooper, Attorney General, State of North Carolina, Respondents–Appellees.

No. 06–11.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 1, 2006.

Decided Feb. 1, 2007.

**ARGUED:** Jennifer Harjo, Smith, Smith & Harjo, Wilmington, North Carolina; Nora Henry Hargrove, Wilmington, North Carolina, for Appellant. Steven Mark Arbogast, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellees.

Before NIEMEYER, WILLIAMS, and KING, Circuit Judges.

Affirmed by published opinion. Judge KING wrote the opinion, in which Judge NIEMEYER and Judge WILLIAMS joined.

KING, Circuit Judge.

Appellant Daniel Cummings, Jr., facing a death sentence imposed by the Superior Court of Brunswick County, North Carolina, appeals from the district court's dismissal of his § 2254 petition for federal habeas corpus relief. *See Cummings v. Polk*, 2006 WL 4007531 (E.D.N.C. January 31, 2006) (the "District Court Decision").[1]

---

1. The District Court Decision is found at J.A. 2187–244. (Citations herein to "J.A. ——"

Cummings has been awarded two certificates of appealability ("COAs"): (1) the district court issued a COA on Cummings's claim that his due process rights were violated by the admission in his sentencing trial of evidence relating to an unadjudicated murder as a "course of conduct" aggravator (the "Evidence Claim"); (2) we granted Cummings a separate COA on his claim that a police officer's *Miranda* warnings, which included the assertion that he could be required to pay for an appointed lawyer, contravened his Fifth and Sixth Amendment rights (the "*Miranda* Claim").[2] As explained below, we deny relief on both Claims and affirm.

## I.

### A.

The circumstances underlying Cummings's appeal involve two separate murders and the investigations relating thereto. The specific convictions and sentence giving rise to this appeal relate to the robbery and death of Burns Babson in Brunswick County, North Carolina, on April 22, 1994. At the sentencing phase of the underlying state court trial, the prosecution sought to prove the aggravating circumstance of "course of conduct involving a crime of violence against another person," and presented evidence relating to the unadjudicated murder of Lena Hales on April 20, 1994, in Robeson County, North Carolina (the "Hales Evidence"). When Cummings was arrested on other charges on April 23, 1994, in Sampson County, North Carolina, he was a suspect in both the Babson and Hales crimes, and he was thereafter interviewed several

times by the authorities of Brunswick, Sampson, and Robeson Counties.

The Evidence Claim implicates the admission, during the sentencing phase of trial, of the Hales Evidence to prove the aggravating circumstance of a "course of conduct involving a crime of violence against another person," and the instructions given the jury regarding that evidence. The *Miranda* Claim relates to the April 24, 1994 interview of Cummings by Detective Tom Hunter of the Brunswick County Sheriff's Department (the "Hunter Interview").

### B.

On April 22, 1994, Burns Babson, a 74-year-old North Carolinian who operated a country store in the small community of Ash, in Brunswick County, was killed during the robbery of his business. The relevant facts surrounding the Babson murder, as spelled out by the Supreme Court of North Carolina, were in part as follows:

> At the time of his death, [Burns] Babson was operating a store [near] his home in Ash, North Carolina, where he resided with his wife of over fifty-two years.
>
> . . . .
>
> At trial, the State's evidence tended to show the following: On 22 April 1994, while in her home, Mrs. Babson heard three or four gunshots fired in rapid succession. She ran into the yard and saw a man standing in the doorway of her husband's store. The man went around to the front of the store building, fired a gun at Mrs. Babson, and then got into a white van parked near the store. Mrs. Babson ran to a neighbor's house

refer to the contents of the Joint Appendix filed in this appeal.)

**2.** Section 2253(c)(1)(A) of Title 28 precludes a court of appeals from exercising jurisdiction "[u]nless a circuit justice or judge issues

a[COA]. Pursuant to § 2253(c)(2), a COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."

and called 911. She then entered the store, where she found her husband lying on the edge of a recliner behind the counter with a bullet wound in his head.

Ronnie Babson, Mr. Babson's son . . . entered the store and went over to where Mr. Babson's body was lying. He moved Mr. Babson's head from the chair and placed his body on the floor. He noticed that the .38–caliber revolver which his father ordinarily kept behind the counter was missing.

*See State v. Cummings*, 346 N.C. 291, 488 S.E.2d 550, 555–56 (1997) (the "State Court Decision").[3]

According to the state court records, Cummings was arrested on April 23, 1994, in Sampson County, North Carolina, for driving a stolen vehicle matching the description of a vehicle involved in several break-ins in that county. Following the arrest, the Sampson County authorities contacted nearby police departments to check for outstanding warrants on Cummings. As a result, Detective Tom Hunter of the Brunswick County Sheriff's Department and Detective E.B. Smith of the Red Springs Police Department (in Robeson County) went to the Sampson County Jail to question Cummings regarding the Babson and Hales murders.

Cummings was interviewed at least six times in late April 1994 before being arrested for the Babson murder, and he was

given *Miranda* warnings on each occasion.[4] The *Miranda* Claim arises from the Hunter Interview, which was Cummings's initial interview with Detective Hunter regarding the Babson crimes. According to Detective Hunter's testimony at a pre-trial suppression hearing conducted on November 14, 1994, he questioned Cummings in the Sampson County Jail on April 24, 1994, concerning the Babson robbery and murder. At the start of the Hunter Interview, Hunter reviewed a *Miranda* rights form with Cummings. The form provided that "[i]f you want a lawyer before or during questioning but cannot afford to hire one, one will be appointed to represent you at no cost before any questioning." J.A. 133. Detective Hunter disagreed with the language of the form, crossed out the words "at no cost," and told Cummings, "I don't know why they put in this at no cost. If you are found innocent, it is no cost but if you are found guilty there is a chance the state will require you to reimburse them for the attorney fees." *See id.* at 134–35. According to the State Court Decision, Hunter testified that after Cummings waived his *Miranda* rights, he stated the following:

> [H]e was picked up by a black male named Joe driving a white van. . . . [Cummings] stated that he and Joe had stopped at Mr. Babson's store for a drink of water on the day of the murder. They left the store only to return twenty

---

**3.** The State Court Decision, rendered on July 24, 1997 by the Supreme Court of North Carolina in Cummings's direct appeal, constitutes the state court adjudication of the two claims under review here—the Evidence Claim and the *Miranda* Claim—to which we accord AEDPA deference. *See infra* Part II.

**4.** According to state court testimony, Cummings was interviewed on six occasions prior to his arrest on April 28, 1994, for the Babson crimes: (1) by Detective Mattocks of the Sampson County Sheriff's Department, at the Sampson County Jail on April 23, 1994; (2)

by Detective Smith of the Red Springs Police Department, at the Sampson County Jail on April 23, 1994; (3) by Detective Hunter of the Brunswick County Sheriff's Department, at the Sampson County Jail on April 24, 1994 (the Hunter Interview); (4) by Detective Smith at the Sampson County Jail on April 25, 1994; (5) by Detective Smith at the Red Springs Police Department on April 25, 1994; and (6) by Officers Johnson and Storms, as well as Detective Hunter, at the New Hanover County Sheriff's Department on April 25, 1994 during a polygraph examination.

or thirty minutes later intending to rob Mr. Babson. [Cummings] parked the van and then walked around the store. He heard four shots fired, went into the store, and saw Mr. Babson lying behind the counter. [Cummings] saw a woman near the store, fired one shot at her, and returned to the van where he found Joe waiting.

*Cummings,* 488 S.E.2d at 556–57.

During the days immediately following the Hunter Interview, Cummings was interviewed on other occasions and gave additional statements relating to the robbery and events at Babson's store. On April 25, 1994, following a fresh *Miranda* warning, and in the course of a polygraph examination, Cummings acknowledged his involvement in the Babson robbery as follows:

I parked the van outside and left the door open. I went inside and asked the old man about the pool tables. He told me to go on in and cut the lights on. I told the old man to, "Give me your money". The old man went towards the cash register and I thought he was going to get the money. The old man came back with a gun and shot at me. I crawled around the counter and we struggled over the gun. I believe I heard or counted about four shots that went off inside the store. I took the old man's wallet. . . . I did not see where the old man got shot. I got the money out of the cash register and left the old man laying face down in the chair.

J.A. 274–75.

On May 23, 1994, Cummings was indicted in Brunswick County for the first de-

gree murder of Burns Babson. On October 17, 1994, he was again indicted in Brunswick County for the related offenses of robbery with a dangerous weapon and assault with a deadly weapon with intent to kill. Prior to his trial, Cummings moved to suppress the various statements and confessions he made after his April 23, 1994, arrest, contending that, among other things, his *Miranda* rights had been contravened.[5] In his suppression effort, Cummings asserted that Hunter's actions with respect to the *Miranda* warnings of April 24, 1994, violated his Fifth and Sixth Amendment rights. Cummings further maintained that, due to the erroneous *Miranda* warnings and their "chilling" of his Sixth Amendment right to counsel, all statements he made thereafter must be suppressed. These assertions underlie the COA issued with respect to the *Miranda* Claim.

The evidence presented in the guilt phase of Cummings's trial in Brunswick County, which lasted from late November 1994, to December 16, 1994, implicated Cummings in the Babson crimes. Witness Donald Ray Long testified that, on the day of the Babson robbery and murder, Cummings stopped at Long's farm supply store, about a mile east of Babson's store, asked for directions from Long, and then drove off in the direction of Babson's store. Another witness, Martha Fowler, testified that Cummings twice entered her store—about six miles from Babson's—on the evening of the Babson

---

**5.** At the suppression hearing, Cummings contended that his statements and confessions were not voluntary because he was suffering from drug withdrawal. *See State v. Cummings,* 346 N.C. 291, 488 S.E.2d 550, 563 (1997) Cummings also maintained in the district court that his statements should have been suppressed because his lengthy pre-charge detainment (six days) was a violation of his due process rights. The district court granted summary judgment against Cummings on this issue, and Cummings was not granted a COA thereon. The detainment issue was not raised in the trial court, but was reviewed and denied (on plain error review) by the State Court Decision. *See Cummings,* 488 S.E.2d at 563.

crimes. Officer Thomas Trochum, an expert in firearms identification, testified that Babson's death resulted from two fatal gunshot wounds, one in the eye and the other in the lower back, from .44 caliber bullets that could not have been fired by Babson's own .38 caliber revolver. Most significantly, Cummings's statements were introduced, including his statement during the polygraph examination of April 25, 1994, admitting that he had robbed Babson's store and engaged in a struggle that resulted in Babson being shot. On December 16, 1994, the jury found Cummings guilty of all three offenses relating to the Babson murder.

### C.

During the trial's sentencing phase, which was conducted before the same jury and also ended on December 16, 1994, the prosecution introduced evidence (over objection) concerning the unadjudicated murder of Lena Hales. Ms. Hales, an 80-year-old woman, had been killed in nearby Robeson County, North Carolina, two or three days before the Babson murder. Ms. Hales's daughter, Barbara Kinlaw, testified that she found her mother at home unconscious and badly beaten on the morning of April 20, 1994, and that Ms. Hales had died from her injuries later that day. Cummings admitted that he had robbed Ms. Hales at her home during the early morning hours of April 19, 2004, but denied hurting her in any way. As spelled out in the State Court Decision:

> [Detective] Edward Smith testified that on 26 April 1994, [Cummings] made a statement in which he admitted that he broke into Mrs. Hales' home looking for money to buy drugs. He testified that Mrs. Hales retrieved her pocketbook from a closet and gave him all of the money that she had in it. [Cummings]

told her not to yell, or he would come back and hurt her.

Dr. Deborah L. Radisch, the associate chief medical examiner for the State of North Carolina, testified that she performed the autopsy on Lena Hales. Dr. Radisch noted multiple bruising upon the head, neck, shoulder, chest, back, arms, and legs. Her internal examination revealed a bruising and swelling of the top of the scalp. In Dr. Radisch's opinion, Mrs. Hales' death was caused by a "blood clot over the brain due to a blunt trauma of the head."

*Cummings,* 488 S.E.2d at 557–58.

Detective Smith testified that, when he interviewed Cummings on April 26, 1994, Cummings gave a statement regarding his activities from April 18 to April 20, 1994. In summary, Cummings stated that sometime around midnight on April 19, he went door to door in Red Springs, making inquiries of those who answered. He said that if someone had opened a door and a pocketbook had been visible and nearby, he planned to grab it and run. After this effort proved unsuccessful, Cummings met with two friends and spent an hour or so looking for drugs. Unable to find drugs, they parted ways around 2:30 a.m. and Cummings told the others that he was going to find some money. Cummings walked toward a nearby store that he contemplated breaking into but, fearing an alarm, decided against doing so. Cummings then noticed a house behind the store without any nearby vehicles or lights. Cummings kicked out a window and entered the house, walking over a bed and moving into a hallway. He noticed a lady standing in another room peering out a door and, as she turned, Cummings told her to give him her money. As she pleaded for her safety, Cummings grabbed her arm and led her to a bedroom were she retrieved a pocketbook and gave him all

her money. Cummings stuffed the money in his pants, told the lady to lie down in bed, threatened to come back and hurt her if she got up or yelled, and then left.

Detective Smith testified that Cummings's statements on the Hales crimes were consistent with his observations of Ms. Hales's home when he answered a call there early on April 20, 1994. When Smith arrived at the home, Ms. Hales had already been transported to a hospital after being discovered by her daughter. Smith noted morning papers on the front porch dated April 19 and 20, 1994. Cummings denied hurting Ms. Hales, asserting that he had only robbed the woman and left her on the bed unharmed. At the time of the Babson trial, Cummings had been indicted in Robeson County for the Hales murder and related offenses, but the charges were unadjudicated.

In the sentencing phase of Cummings's trial, the court instructed the jury regarding the course of conduct aggravator as follows:

> If you find from the evidence beyond a reasonable doubt that in addition to killing [Babson], [Cummings], on or about the alleged date, was engaged in a course of conduct which involved the commission of another crime of violence against another person and that these other crimes were included in the same course of conduct in which the killing of [Babson] was also a part, you would find this aggravating circumstance....

J.A. 541. By its Verdict, the jury recommended that Cummings receive the death penalty for the Babson murder, finding it part of a course of conduct that included crimes of violence against another person

(Lena Hales), and that the Babson murder had been committed for pecuniary gain. The court imposed sentence on December 16, 1994, including the death penalty for the Babson murder, forty years for robbery with a dangerous weapon, and ten years for assault with a deadly weapon.

On July 24, 1997, the State Court Decision affirmed Cummings's convictions and sentences relating to the Babson murder. *See Cummings*, 488 S.E.2d at 555. The Supreme Court of the United States thereafter denied certiorari. *See Cummings v. North Carolina*, 522 U.S. 1092, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998). On December 4, 1998, Cummings filed a motion for appropriate relief (the "MAR") in the Superior Court of Brunswick County (the "MAR Court"), which he later amended.[6] On May 9, 2001, the MAR Court conducted an evidentiary hearing on the claims asserted in the MAR, and it denied those claims by Order of June 19, 2001 (the "MAR Decision").[7] The Supreme Court of North Carolina thereafter denied certiorari on the MAR Decision. *See State v. Cummings*, 356 N.C. 618, 575 S.E.2d 34 (2002).

On November 19, 2001, while his certiorari petition was pending in the Supreme Court of North Carolina, Cummings filed the § 2254 petition that gives rise to these proceedings, seeking habeas corpus relief in the Eastern District of North Carolina. On January 31, 2006, the district court dismissed three of the § 2254 petition's twenty-one claims, and the District Court Decision granted summary judgment to the State on the remaining eighteen claims. The district court, on May 18, 2006, granted Cummings a COA on the

---

6. A defendant convicted of a crime in North Carolina is entitled to seek post conviction relief by way of an MAR. *See* N.C. Gen.Stat. § 15A–1401. An MAR is not identical to a habeas corpus petition, but it provides an avenue to obtain relief from "errors committed in criminal trials." *Id.*

7. The MAR decision is found at J.A. 1626–78.

Evidence Claim. We thereafter granted Cummings a COA on the *Miranda* Claim. We possess jurisdiction pursuant to 28 U.S.C. § 2253.

## II.

■■■■ We review de novo a district court's award of summary judgment, applying AEDPA's deferential standard of review to the state court's adjudication of a petitioner's claims on their merits. *Robinson v. Polk*, 438 F.3d 350, 354 (4th Cir. 2006).[8] Pursuant to AEDPA, we may award habeas corpus relief on a claim that was adjudicated on its merits in state court only if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court has explained, a state court decision is contrary to clearly established federal law if the "court arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is an unreasonable application of federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407, 120 S.Ct. 1495. A state court decision may also be an unreasonable application of federal law if it applies Su-

preme Court precedent "in a different factual context from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the principle of a precedent in a context where such failure is unreasonable." *Robinson*, 438 F.3d at 355 (internal quotation marks omitted).

## III.

Two issues are presented for consideration in this appeal. First, in connection with the Evidence Claim, the district court granted a COA on Cummings's contention that the admission of the Hales Evidence as an aggravating factor during the trial's sentencing phase violated his constitutional rights. Second, on the *Miranda* Claim, we granted Cummings a COA on his claim that his Fifth and Sixth Amendment rights were violated by the admission at trial of statements that resulted from an erroneous *Miranda* warning at the Hunter Interview. We address these claims in turn.[9]

### A.

■■■ Cummings first contends that, at the time of the Babson trial, he was presumed innocent of the unadjudicated Hales murder used to prove the course of conduct aggravating factor, and that this aspect of his trial was constitutionally flawed by the admission of the Hales Evidence. Alternatively, he maintains that the trial court violated his due process rights by admitting the Hales Evidence without an instruction that the jury was obliged to find each element of the Hales murder proven beyond a reasonable doubt.

---

8. "AEDPA" is the well-known acronym for the Antiterrorism and Effective Death Penalty Act of 1996.

9. Because we affirm the district court's decisions on both claims, we need not reach or address whether an improper *Miranda* warning given at the Hunter Interview might have been harmless error.

In connection with the Evidence Claim, Cummings has failed, as the district court properly observed, to point us to any clearly established federal law, determined by the Supreme Court, that precludes the admission of evidence of unadjudicated crimes in capital sentencing proceedings. *See* District Court Decision 30. There is authority in our Circuit, however, as well as in others, that such evidence may properly be utilized in a capital sentencing trial. *See United States v. Higgs*, 353 F.3d 281, 322–23 (4th Cir.2003) (upholding admission of evidence of unadjudicated obstruction of justice offense during capital sentencing); *Devier v. Zant*, 3 F.3d 1445, 1464 (11th Cir.1993) (allowing introduction of evidence of unadjudicated rape offense to prove aggravating circumstance at capital sentencing).

On direct review of Cummings's conviction and sentence, the State Court Decision ruled that there was sufficient evidence—by way of Cummings's statements—to justify the admission of the Hales Evidence in connection with the course of conduct aggravator. *See State v. Cummings*, 346 N.C. 291, 488 S.E.2d 550, 572 (1997). The court deemed the evidence sufficient to show that Cummings was seeking money to buy drugs when he broke into the Hales home. *See id.* at 573. Ms. Hales was badly beaten, resulting in her death, and the court concluded that the evidence demonstrated a link between the Babson and Hales murders: both crimes had occurred within a few days of one another; both were committed for the purpose of obtaining drug money; and both involved elderly victims. *See id.* at 572–73. In addition, Cummings admitted robbing both of his victims and strongly implicated himself in both murders, which were committed in close geographic proximity to one another. Thus, the court found the Hales Evidence sufficient to be submitted to the jury at sentencing. *See id.* at 573.

We recognize that at least two judges, including a Supreme Court Justice, have expressed disagreement with this proposition. *See Williams v. Lynaugh*, 484 U.S. 935, 937–38, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987) (Marshall, J., dissenting) ("Whether a State may introduce evidence of unadjudicated offenses in the sentencing phase of a capital trial is a vexing question.... In my view, imposition of the death penalty in reliance on mere allegations of criminal behavior fails to comport with the constitutional requirement of reliability."); *see also Devier v. Kemp*, 484 U.S. 948, 949, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987) (Marshall, J., dissenting) ("[T]he admission of evidence of unadjudicated crimes at the sentencing phase impinges on the unique constitutional concern for reliability in capital trials."). Indeed, the experienced district judge who ruled against Cummings in the District Court Decision gave voice to his own misgivings about the use of the Hales Evidence against Cummings in the sentencing trial. *See* District Court Decision 30 n. 12 ("This Court, while recognizing [Cummings] cannot succeed on his claim, is wary of the constitutional implications that may arise from the admission of unadjudicated criminal conduct in this context."). In any event, we are obliged in this proceeding to apply the deferential AEDPA standard of review to the Evidence Claim. Assessed in that context, the State Court Decision on the admission of the Hales Evidence in the sentencing trial was not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

■ Furthermore, Cummings has failed to point us to any clearly established federal law mandating that a trial court in-

struct a sentencing jury that each element of an unadjudicated crime, when being used to prove an aggravating factor in a capital sentencing proceeding, must be proven beyond a reasonable doubt. At Cummings's sentencing trial, the court instructed the jury regarding the course of conduct aggravator as follows:

> If you find from the evidence beyond a reasonable doubt that in addition to killing [Babson], [Cummings], on or about the alleged date, was engaged in a course of conduct which involved the commission of another crime of violence against another person and that these other crimes were included in the same course of conduct in which the killing of [Babson] was also a part, you would find this aggravating circumstance....

J.A. 541. Addressing the adequacy of this instruction on direct appeal, the State Court Decision applied a plain error standard of review (Cummings had failed to object to the instruction concerning the course of conduct aggravating circumstance) and found no error. *See Cummings,* 488 S.E.2d at 573. In view of the lack of Supreme Court authority addressing this matter or mandating an instruction in a capital sentencing trial that each element of an unadjudicated crime must be proven beyond a reasonable doubt, we are constrained to conclude that the State Court Decision concerning the instruction on the Hales Evidence was not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Thus, in applying the deferential AEDPA standard of review, we reject the Evidence Claim on its merits.

### B.

Cummings next contends, in the context of the *Miranda* Claim, that the statements he made after the *Miranda* warnings given by Hunter should have been suppressed because they were secured in violation of his constitutional rights, as a result of Hunter's erroneous advice that a court-appointed lawyer is not free. It is well established, of course, that a state must provide a court-appointed lawyer to an indigent who has requested one, prior to a custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under North Carolina law, an indigent is entitled to a court-appointed lawyer once he is involved in adversarial proceedings that jeopardize his liberty interests. *See* N.C. Gen.Stat. § 7A–451 ("An indigent person is entitled to services of counsel .... as soon as feasible after the indigent is taken into custody .... [and that right] continues through any critical stage of the action or proceeding."). North Carolina, as well as certain other states, retains a general lien against such an indigent's future earnings, should he later become able to pay. *See* N.C. Gen.Stat. § 7A–455(b).

The Supreme Court of North Carolina addressed and rejected the issue presented in the *Miranda* Claim when it rendered the State Court Decision:

> The rights read by Detective Hunter to [Cummings] on 24 April 1994 constituted a fully effective equivalent of the *Miranda* rights. *Miranda* does not require that the officer inform an indigent defendant that an attorney would be appointed for him at no cost. All that is required is that the defendant be informed that an attorney will be appointed for him before questioning if he so desires.
>
> . . .
>
> Further, the additional information supplied by Detective Hunter to [Cummings] was accurate. Under North Carolina law, indigents are entitled to court appointed counsel whenever they

are involved in adversarial proceedings that jeopardize their liberty interests.

. . . .

Informing [Cummings] that he may be required to reimburse the State for the costs of his attorney also does not "chill" his right to have counsel provided.

*State v. Cummings*, 346 N.C. 291, 488 S.E.2d 550, 565–66 (1997). In support of its decision on this issue, the court relied on *Fuller v. Oregon*, where the Supreme Court upheld the constitutionality of an Oregon statute authorizing the state's recoupment of expenses for providing counsel to an indigent who has acquired the financial ability to pay. 417 U.S. 40, 54, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974). In addressing *Fuller's* constitutional challenge to the Oregon statute, the Supreme Court rejected the contention that knowledge that an indigent might later be obliged to repay the state for the costs and expenses of his appointed lawyer might "chill" his Sixth Amendment right to counsel. *Id.* at 51–52, 94 S.Ct. 2116. In so ruling, the Court observed that "[t]he fact that an indigent who accepts state-appointed legal representation knows that he might someday be required to repay the costs of these services in no way affects his eligibility to obtain counsel." *Id.* at 53, 94 S.Ct. 2116.

In this appeal, Cummings maintains that the State Court Decision on the *Fuller* principles was an unreasonable application of Supreme Court law, because the issue in *Fuller*—whether it was unconstitutional to require an indigent to repay the state for his appointed counsel—is not the same as the *Miranda* Claim. Cummings contends in his *Miranda* Claim that Hunter's reading of his *Miranda* rights, coupled with the statement that an appointed lawyer would not be free, was an inadequate *Miranda* warning under the

Fifth Amendment—indeed, he contends that it was constitutionally erroneous. Cummings contends that Hunter's version of the *Miranda* warning resulted in an "unintentional relinquishment of his right to an attorney," which would constitute an improper waiver of his *Miranda* rights. Cummings maintains that, because the *Miranda* warning was constitutionally flawed, the statements he made at the Hunter Interview and thereafter should have been suppressed.

■ Under *Miranda*, an officer who takes a suspect into custody must inform him, among other things, of his right to have counsel appointed before questioning and that, if he cannot afford counsel, one will be appointed for him if he chooses. 384 U.S. at 472, 86 S.Ct. 1602. Of course, as the Court has explained, the right to counsel during a custodial interrogation can be waived:

> *Miranda* holds that the defendant may waive effectuation of the rights conveyed in the warnings provided . . . . the relinquishment of the right must have been voluntary . . . . [and] the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (internal quotation marks omitted). Thus, the Fifth Amendment question raised in the *Miranda* Claim is whether the *Miranda* warnings given at the Hunter Interview were sufficient to make Cummings aware of his rights and the consequences of waiving them.

■ It is important that, as the Supreme Court has explained, *Miranda* does not mandate a precise formulation of its warnings. *See Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). Instead, "[t]he inquiry is sim-

ply whether the warnings reasonably convey to a suspect his rights as required by *Miranda.*" *Id.* at 203, 109 S.Ct. 2875 (internal quotation marks omitted). In *Duckworth,* the suspect was read a waiver form which, in advising him of his *Miranda* rights, included a provision that a lawyer would be appointed "if and when you go to court." *Id.* at 198, 109 S.Ct. 2875. Duckworth signed the waiver and then made an exculpatory statement to the officers. *See id.* His exculpatory statement conflicted, however, with an inculpatory statement he made to the authorities at a later date. *Id.* at 199, 109 S.Ct. 2875. When the conflicting statements were both presented against Duckworth at trial, the court ruled that the *Miranda* warnings had been adequate, observing that "th[e] instruction accurately described the [state's] procedure for the appointment of counsel." *Id.* at 204, 109 S.Ct. 2875.

In this situation, the form utilized by Detective Hunter on April 24, 1994, in advising Cummings of his *Miranda* rights at the Hunter Interview, correctly stated that "[i]f you want a lawyer before or during questioning but cannot afford to hire one, one will be appointed to represent you at no cost before any questioning." J.A. 133. During the advice of rights process at the Sampson County Jail, however, Hunter crossed out the words "at no cost" and advised Cummings "I don't know why they put in this at no cost. If you are found innocent, it is no cost but if you are found guilty there is a chance the state will require you to reimburse them for the attorney fees." *See id.* at 133–34. Like the *Miranda* warnings in *Duckworth,* Hunter's statement that a suspect could be required to pay for his lawyer was an accurate description of North Carolina's statutory procedure for the appointment of counsel. *See* N.C. Gen.Stat. § 7A–455(a).

Although the impact of Hunter's ad hoc statements to Cummings may be debatable, we are obliged in this § 2254 proceeding to apply AEDPA's deferential standard of review. In light of the principles of *Miranda,* and *Duckworth,* the State Court Decision's application of *Fuller,* viewed in the context of the facts presented, was not unreasonable. Because Cummings has failed to show that the State Court Decision was not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court, the *Miranda* Claim must also be rejected.

IV.

Pursuant to the foregoing, we reject the Evidence Claim and the *Miranda* Claim, and we affirm the district court.

*AFFIRMED*